THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PHILIP E. GILLESPIE, Defendant-Appellant.

(No. 73-237; )

Second District—December 26, 1974.

Van R. Richards, of Elgin, for appellant.

Gerry L. Dondanville, State's Attorney, of Geneva (Clarence Wittenstrom, Jr., Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE LITTLE delivered the opinion of the court:

Defendant was indicted and tried by a jury in Kane County for burglary. Following a verdict of guilty, his motion for new trial and application for probation were denied. He was sentenced to a term of from 2⅓ to 7 years. Defendant appeals his conviction on two grounds. The first is that the trial judge erred in overruling his objection to expert testimony relating to blood grouping tests and statistics. The second is that defendant was not proven guilty beyond a reasonable doubt. The real contested element in the case is whether the defendant was properly identified beyond a reasonable doubt as one who committed a burglary. The evidence directed toward that issue is solely circumstantial, and a detailed summary of the facts is appropriate.

At about 7 o'clock at night on November 25, 1972, the owner of a television and appliance store in Elgin had occasion to return there after closing hours. As he looked through the glass front door, he saw on the floor a ring of keys usually kept in the cash register. After entering, he noticed that certain merchandise had been disturbed and he felt a strong wind coming from the rear of the building. Closer inspection disclosed that wooden paneling forming a false wall in front of a back window had been pushed in and the glass window pane had been broken. A television set too large to fit through the opening was near the window. He called the police who investigated. In addition to the foregoing, jimmy marks were observed on the inside of the rear door, and it was determined that several television sets were missing. Following the investigation, the paneling in front of the broken window pane was nailed back in place. The police and owner then left the store.

Later that night, between 10 and 11 o'clock, a part-time employee of a nearby VFW Hall observed a Mustang automobile backed up to the store. He saw two occupants in the automobile, but was unable to identify either, except as to race, which he characterized as black. A while later, he noticed that the hood and trunk of the Mustang were open, but saw no one near the car. Then, as he entered his own automobile parked nearby, he heard the sound of glass breaking. He immediately wrote down the license number of the Mustang and telephoned the police from across the street. When he returned, the Mustang was not there.

In response to his telephone call, the police and owner returned to the store. The glass front door was shattered. Most of the broken glass was on the outside of the door, indicating to them that it had been broken out from inside the building. There was a television console too large to fit through the glass opening immediately inside the door. Blood stains

were on top of the set and were also discovered near the broken window and at other locations in the store. The wooden paneling which recently had been replaced was once again pushed in. The owner found that since they had previously left the store, other television sets were missing. A glazier was called to replace the glass in the front door and the rear window was boarded.

In the meantime, detectives had ascertained the name of the owner of the Mustang to be Robert Powell. They proceeded to his address where they saw it parked and observed blood stains on the floor of the car and also on the sleeve of a jacket inside it. The detectives then went to Powell's apartment. There were blood stains outside the door. They knocked, identified themselves, and were admitted by Powell. Inside were Powell, his wife and baby, the defendant and Isaac Gist. Defendant's arm was wrapped with a blood-soaked bandage secured with black electrical tape. Gist also had a small cut on his hand. They told police that they had been fighting. Several television sets, later identified as those missing from the store, were found in the apartment. The police also discovered a blood-soaked rag and blood stained television tags in the kitchen wastebasket. Other television sets were found under a stairway in the building. Powell, Gist and the defendant were taken into custody and charged with burglary. In the course of examining and administering first aid to the defendant, it was observed that the cuts on his arm were fresh and bleeding. Later, defendant was taken to a hospital, and, with his consent, two blood samples were drawn. The police also obtained scrapings of the dried blood stains from various locations within the store. The blood samples and scrapings were then submitted to the State crime laboratory for tests.

Powell testified that he and the defendant spent the afternoon drinking. Around 6:30 P.M. they drove in Powell's Mustang to a tavern across the street from the television store. As they entered the tavern, the defendant asked Powell for his car keys. He gave them to the defendant who then left. Powell had a drink and in a while defendant returned. When they returned to the Mustang, it had been moved from its previous parking space. They stopped by another tavern for a few drinks and then defendant drove Powell to his apartment and let him out. Later that night defendant and Gist came to Powell's apartment bearing television sets. Shortly thereafter the police arrived. Although Powell was charged with burglary, he had not been indicted at trial time. Gist was indicted, but his whereabouts at the time of trial was not known.

The contested evidence matters arose during the testimony of Robert Gonsowski, the State's witness on blood grouping tests. He testified about

his professional education, training and experience as a certified serologist and his employment as a criminalist for the State Crime Laboratory at Joliet. His acceptance by the trial court as an expert in the scientific study of the properties and action of serum of the blood was unchallenged by defendant. He testified about the history of the ABO blood grouping system and the classifications into A, B, O and AB blood types. He described other characteristics of blood, including the RH factor and a "rheumatoid arthritis factor," which he said are unrelated. With respect to the latter, he testified that the blood of all persons known to have that disease contains an identifiable characteristic known as a positive rheumatoid arthritis factor. He testified further that a finding of a positive rheaumatoid arthritis factor in one's blood did not necessarily mean that such person suffered from the disease.

With respect to the blood samples and scrapings submitted for examination, he described the tests he conducted and the results found. He stated that the dried blood, identified as that found at the scene of the burglary, was determined to be human blood, type A, with a positive rheumatoid arthritis factor. The whole blood samples, identified as those taken from the defendant, were found to be human blood, type A, RH positive, with a positive rheumatoid arthritis factor. He then stated that he did not form any conclusions as to identity, but merely reported his findings. He further testified, over objection, that approximately 41 per cent of the Caucasian population and 27 per cent of the Negro population have type A blood. He also stated that from 5 to 10 per cent of the population as a whole have a positive rheumatoid arthritis factor in their blood regardless of the blood group in which they are classified. By combining such statistics, he said that 4.1 per cent of the Caucasian population and 2.7 per cent of the Negro population could have Type A blood, with a positive rheumatoid arthritis factor. He testified that the foregoing statistics were based upon journals published by two named pharmaceutical firms. On cross-examination, he testified that those firms sell chemical reagents to hospitals and laboratories for use in conducting tests and they compile the blood grouping statistics based upon data supplied by blood banks throughout the country. Concerning the RH factor, he stated that his laboratory was not equipped to conduct such tests on dried blood and he had no knowledge whether another laboratory had conducted such tests. He testified that approximately 85 percent of the population at large has a positive RH factor in their blood but he had no statistics at hand concerning the frequency of the RH factor in the Negro population.

In defendant's behalf, his sister testified that the defendant had par-

ticipated in athletics and had served in the Navy for 4 years. Neither he nor any member of their family had a history of or suffered from rheumatoid arthritis.

██ Defendant's first ground for reversal on appeal is that the trial court erred in admitting the results of the blood tests conducted in this case and in allowing the State's expert witness to testify as to statistics of blood types in the population at large. As to the first point, defendant urges that the court should adopt an exclusionary rule restricting admission of blood tests to instances excluding suspects as the ones committing the crime. As to the second, he asserts that the similarity of blood types found at the scene of the burglary with his own merely places him in a huge numerical group of persons and does not satisfy the requirement of proof beyond a reasonable doubt. Defendant failed to raise any objection to the admission of the results of blood tests during the course of trial, thereby precluding him from asserting such as error on appeal. However, the revelancy of blood grouping tests to establish identity in criminal cases is a matter of first impression in the reviewing courts of Illinois and, for that reason, the court will consider the points raised initially on the appeal.

The reviewing courts of this State have not heretofore considered the admissibility of blood grouping tests generally, as distinguished from chemical tests of blood to determine intoxication or disease. However, the admissibility of blood grouping tests in civil and criminal cases has been before other courts in the United States for over forty years. The pioneering work in grouping or typing blood was done about the year 1900 and is reviewed in the Annotation, "Blood Grouping Tests," 163 A.L.R. 939, 941-42, as follows:

"Dr. Landsteiner discovered the presence of two genes (also known as antigens or agglutinogens) called 'A' and 'B' in the human blood. Thus the blood of every individual falls in one of the following groups:

Group A (red blood cells containing only gene A).
Group B (red blood cells containing only gene B).
Group AB (red blood cells containing both genes A and B).
Group O (red blood cells containing neither gene A nor B).

\* \* \*

It is possible to determine in which group the blood of a particular person belongs by mixing a sample of his blood with solutions containing the antibodies and observing whether or not the blood clots (or agglutinates). Blood belonging to groups A, B, and AB will clot when in contact with antibodies a, b, and a or

b, respectively, but blood in group O will not agglutinate in the presence of either antibody."

A supplemental annotation in 46 A.L.R.2d 1000, at page 1025, states:

"There seems to be substantial agreement among the courts that the results of blood grouping tests are admissible in evidence (notably in criminal prosecutions) on the question whether particular blood (or bloodstains) was (or was made by) the blood of a specified individual."

It is common knowledge that the medical profession relies on the ability of technicians to determine blood types with accuracy in order to administer blood transfusions. In a similar context, the supreme court said in *People v. Adams*, 25 Ill.2d 568, 573-74:

"While this court has not previously passed upon the admissibility of tests designed to establish the amount of alcoholic content in an individual's blood stream, such tests are generally accepted by the medical profession, courts and legislative bodies as reliable, with a direct analysis of the blood, as was here present, being considered the most dependable method."

Accordingly, it is appropriate that the court take judicial notice of the scientific reliability of the ABO system of blood grouping, if predicated upon a sufficient foundation in conducting the tests.

In the case at bar, defendant consented to giving samples of his blood and there has been no objection raised to the chain of custody of the samples and scrapings or to the accuracy of the tests conducted. However, the defendant argues that the Legislature has recognized the danger of admitting results of blood tests in paternity cases by allowing them only if definite exclusion of paternity is established. "An Act in relation to the use of blood tests to determine paternity" (Ill. Rev. Stat. 1973, ch. 106¾, par. 1 *et seq.*) applies only in a civil action, in which paternity is a relevant fact and provides, in part, "The results of the tests shall be receivable in evidence only if definite exclusion is established." By analogy, defendant claims that the rule should be the same in criminal cases, where proof beyond a reasonable doubt is required. The reasons the legislature enacted the exclusionary rule in paternity cases may be based on social policies which override the scientific reliability of the evidence. Suffice it to say that the legislature did not extend the exclusionary rule to criminal cases. The court finds no other expression of public policy, by statute or otherwise, to exclude the results of properly performed blood grouping tests based upon the ABO system of classifying blood types.

Next, the defendant assert that the results of blood tests merely indicate that the blood found at the scene of the burglary could be that

of the defendant and not that it was, in fact, his blood. He concludes that such evidence is inadmissible because it does not satisfy the requirement of proof beyond a reasonable doubt. He argues that the blood left at the scene of the burglary could be that of any one of a large group of other person, and cites *People v. Zammuto,* 280 Ill. 225, to support his theory that such evidence is inadmissible. There, the State sought to prove identity by similarity of the defendant's shoe with shoeprints left in the snow at the scene of a murder. The court observed that evidence concerning footprints may tend to prove identity, where there is a particular characteristic present, but such evidence has no effect in the absence of any peculiarity. It said that any two persons wearing shoes of the same size, if in the neighborhood, would have been liable to the charge with the same evidence, but it held there was no prejudicial error in receiving it. The instant case is distinguishable from *Zammuto* in several important aspects. First, the blood here contained particular characteristics differentiating it from blood generally. Second, the scientific reliability of the two types of evidence differ markedly. Finally, conceding that there may be a large group of persons having type A blood, with a positive rheumatoid arthritis factor, that group is narrowed considerably when confined to those in the neighborhood of the crime who have fresh bleeding cuts on their arms.

■■■ The evidentiary issue involved in proof of identity by circumstantial evidence is one of relevancy. "Relevancy is a tendency to render a proposition in issue more or less probable, in the light of logic, experience, and accepted assumptions concerning human behavior." (Cleary, Handbook of Illinois Evidence § 12.1, at 206 (2d ed. 1963).) The matching of the bood types is only one link in the chain of evidence introduced by the State to prove the defendant's participation in the commission of the crime. In addition, there is evidence that the defendant was in the proximate area of the store during the time it was initially broken into and that he had Powell's Mustang then and at the subsequent break-in. A witness characterized both occupants of the Mustang at the latter time, when it was backed up to the building, as being black. There is no evidence in the record to indicate defendant and Gist were not of that race. Fresh blood stains were found in the store at the broken window and on television sets, on the floor of the Mustang, on the sleeve of a coat in the car, on the walls outside the door of the apartment at which defendant and Gist had recently arrived and on television tags in the kitchen wastebasket. Defendant had a blood-soaked bandage on his arm when apprehended shortly after the second break-in. Defendant and Gist brought recently stolen television sets from

the burglarized store with them into the apartment. None of the foregoing items of evidence, standing alone, proves the defendant's guilt beyond a reasonable doubt. Yet, each is of some weight, more or less, tending to prove that issue. "The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt." (*People v. Bernette*, 30 Ill.2d 359, 367.) The results of the blood grouping tests performed here were properly admitted.

■■ Defendant also urges that the trial court erred in allowing the State's expert witness to testify that approximately 41 per cent of the Caucasian population and 27 per cent of the Negro population have type A blood and that from 5 to 10 per cent of the population as a whole have a positive rheumatoid arthritis factor in their blood. The only objection to such testimony during the trial was that there was no showing of "authoritativeness" of the figures. On appeal, defendant shifts his grounds to lack of "authentication" and that such testimony has no probative value. "A specific objection to evidence, based solely on a particular point, is a waiver of objections on all other points not specified or relied on. [Citations.] A party who seeks to exclude a piece of evidence should be explicit, and disclose to the trial court all defects in the proposed proof which he expects to urge upon this court in the event of an appeal * * * An objection to testimony, to be availed of in this court, must be raised in apt time, when the evidence is introduced." (*Forest Preserve District v. Lehman Estate, Inc.*, 388 Ill. 416, 429-30.) The objection directed to lack of authentication is inappropriate, in any event, because it applies only to documentary evidence. We infer that counsel meant to state as a ground of appeal his objection to the authoritativeness of the statistics, which will be considered. We shall also consider the relevancy objection for reasons heretofore stated.

Mr. Gonsowski was offered by the State as an expert witness in the field of serology and was accepted by the trial court as such. Although he was cross-examined as to his experience and qualifications, no challenge was made to his status as an expert. Accordingly, once he crosses the threshold as an expert witness, he may testify as to facts within the area of his expertise which are not common to the world as an aid to the jury in determining the question at issue. (See *People v. Jennings*, 252 Ill. 534, 550.) Obviously, the frequency of certain blood types among segments of the population is not a matter of common knowledge, but is within the peculiar knowledge of an expert. Whether the blood left at the scene of the burglary is found to be in a relatively smaller or larger segment of

the population is germane to the issue of identification. Thus, the statistics testified to are relevant to prove the guilt of the defendant, and may be considered along with the other circumstances of the case.

■■ The particular facts or special knowledge testified to by an expert, on the one hand, must be distinguished from the basis of such facts or knowledge, on the other. The initial determinations are matters of law for the court to decide, whereas the latter affect the credibility of the witness and the weight to be given his testimony and, thus, are within the province of the jury. (See *Siebert v. People*, 143 Ill. 571, 579-581.) In the instant case, the State's expert witness testified on direct examination that the blood-grouping statistics, which he was about to give, were based on journals published nationwide by a named pharmaceutical company. Defendant's counsel objected to further testimony stating: "I don't know how the pharmaceutical company comes up with the statistics, or * * *." The objection was overruled by the trial judge who observed: "It goes to the weight of the evidence." After the statistics were stated, counsel renewed his objection on the ground that there had been no showing of the authoritativeness of the company's figures. The judge again overruled the objection advising counsel that he could cross-examine the witness on the subject, which he did. We find no error was committed in these rulings.

■■ It should be noted that the statistical information based upon reports published by the pharmaceutical firm is hearsay, at least to the second or third degree. Nevertheless, such information is admissible as an exception to the hearsay rule. At 29 Am Jur 2d *Evidence* § 892, at 999 (1967), the author states:

> "In almost every organized trade or occupation there are handbooks and other publications, containing information of everyday professional and business needs, which are intended to be circulated publicly and to be consulted by persons interested, which are tested by their use, and which are found by their experience to be trustworthy and to be actually relied upon by the persons engaged in the particular trade or occupation concerned. Such publications are generally held or assumed to be admissible under an exception to the hearsay rule that has never been precisely formulated."

Wigmore analyzes this exception under the topic "Learned Treatises" finding that the exception is based upon principles of necessity and trustworthiness. (See 6 Wigmore, Evidence § 1690 *et seq.* (3rd ed. 1940).) Necessity obviates the calling of scores of witnesses with first-hand knowledge of the underlying data collected. Trustworthiness is based upon the publisher's lack of motive to misrepresent, its knowledge that every statement will be subjected to close scrutiny by professional colleagues and

that its reputation depends upon the correctness of the material published. Standard mortality tables are accepted on a similar basis. (See *Henderson v. Harness,* 184 Ill. 520, 529.) The published statistics relating to frequencies of blood types fall within the foregoing exception to the hearsay rule. The journals containing the information might have been admitted in evidence, subject to the usual rules relating to admission of documents, or, as in this case, an expert in the particular field may testify as to the relevant material.

■■ The safeguards for the truth of the facts or validity of the information supplied by an expert witness rest upon opposing counsel under our adversary system of trial advocacy. Supreme Court Rule 412 offers virtually complete discovery of the State's expert witness, his reports and scientific tests. In the case at bar, defendant's counsel received a copy of the witness's written report containing his findings and the statistics of blood groupings to which he testified, in advance of trial. During the course of trial, counsel may avail of extensive cross-examination as to source material, which opportunity was afforded defendant here. The rule was delineated by the supreme court in *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 336, as follows:

> "In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues. (Cf. Model Code of Evidence, Rule 529.) The author's competence is established if the judge takes judicial notice of it, or if it is established by a witness expert in the subject."

In accordance with the foregoing, the statistical information relating to percentages of blood types in the Caucasian and Negro populations and population as a whole was properly admitted for consideration by the jury.

■■ The remaining ground urged on appeal is that the defendant was not proven guilty beyond a reasonable doubt. Counsel argues that the evidence did not exclude every reasonable theory of innocence. He also attacks the credibility of Powell, who had been drinking with defendant on the day of the burglary. The jury was properly instructed as to the applicable law in that regard in accordance with IPI—Criminal, nos. 3.02 and 3.17. The jury observed the witnesses and heard the evidence. "We may not substitute our judgment for that of a jury on questions involving the weight of the evidence or the credibility of the witnesses [Citations], and we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt." (*People v. Mills,* 40 Ill.2d 4, 19.) The evidence is more than sufficient to withstand such test.

Having found no error, the verdict of guilty and judgment of the trial court thereon is affirmed.

G. MORAN and CARTER, JJ., concur.