PEOPLE v HORTON

Docket No. 45666. Submitted April 7, 1980, at Detroit.—Decided July 23, 1980. Leave to appeal applied for.

Charles E. Horton was convicted of felony murder, but acquitted of first-degree criminal sexual conduct, Recorder's Court of Detroit, George T. Martin, J. He appeals alleging 1) his conviction of felony murder is inconsistent with his acquittal of first-degree criminal·sexual conduct and must be reversed, and 2) evidence of blood deposits and other identifiable bodily substances was improperly admitted. *Held:*

1. The conviction of first-degree felony murder is vacated since the jury was not instructed in the law of attempt to commit first-degree criminal sexual conduct, and, thus, the underlying crime must be removed from the jury's consideration, and no murder conviction may be based thereon.

2. The trial court gave proper instructions on the crime of second-degree murder, and, on remand, judgment of guilty of second-degree murder shall be entered and defendant resentenced.

3. Deposits of blood and other identifiable bodily substances do not differ from other pieces of physical evidence or other observations that show possible connections between the defendant and the criminal acts and were properly admitted.

Reversed and remanded.

1. CRIMINAL LAW — INCONSISTENT VERDICTS — RATIONAL BASIS.

Inconsistent verdicts in criminal cases that cannot be reconciled on any rational basis cannot stand.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 76 Am Jur 2d, Trial § 1155 *et seq.*

Inconsistency of criminal verdict as between different counts of indictment or information. 18 ALR3d 259.

[3] 21 Am Jur 2d, Criminal Law §§ 13, 17.

40 Am Jur 2d, Homicide § 72.

73 Am Jur 2d, Statutes § 293.

[4] 75 Am Jur 2d, Trial § 713.

[5] 29 Am Jur 2d, Evidence §§ 769, 775.

75 Am Jur 2d, Trial § 346 *et seq.*

2. CRIMINAL LAW — FELONY MURDER CONVICTION — CRIMINAL SEX-
   UAL CONDUCT — INCONSISTENT VERDICTS.

   A felony murder conviction based on a completed act of criminal
   sexual conduct cannot stand together with a verdict of not
   guilty of the same criminal sexual conduct charged in another
   count.

3. CRIMINAL LAW — FELONY MURDER STATUTE — CONSTRUCTION —
   ATTEMPTED FELONIES — DEFINITION — JURIES — INSTRUCTION.

   Criminal statutes are to be narrowly construed, and the felony
   murder statute, which provides for a conviction of first-degree
   murder where murder arises out of an attempt to commit one
   of the listed felonies, must be construed to mean a legally
   culpable "attempt" defined by statute and case law and not
   what any single jury may consider "attempt" to mean in the
   absence of instructions by the trial court (MCL 750.316; MSA
   28.548).

4. CRIMINAL LAW — FELONY MURDER STATUTE — JURIES — INSTRUC-
   TIONS — ATTEMPT.

   A jury must be properly instructed with regard to the elements
   which constitute an attempt to commit a crime to allow a
   felony murder conviction upon a finding of an attempt to
   commit one of the felonies enumerated in the felony murder
   statute (MCL 750.316; MSA 28.548).

5. CRIMINAL LAW — PHSYICAL EVIDENCE — BODILY SUBSTANCES —
   WEIGHT — JURIES.

   Deposits of blood and other identifiable bodily substances do not
   differ from other pieces of physical evidence or other observa-
   tions that show possible connections between a defendant and
   criminal acts and may be properly admitted, the weight of the
   evidence being left for the jury's determination.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Don W. Atkins,* Assistant Prosecuting Attorney, for the people.

*Gail Rodwan,* Assistant State Appellate Defender, for defendant on appeal.

Before: DANHOF, C.J., and CYNAR and MAC-KENZIE, JJ.

DANHOF, C.J. The defendant was tried before a jury on charges of felony murder and first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2), arising out of the death of one Ms. Smith on October 5, 1978. Convicted of felony murder but acquitted of criminal sexual conduct, he brings this appeal as of right.

The testimony indicated that the defendant lived with the victim and a Ms. Jones and her three children in Ms. Jones' apartment. When Ms. Jones left her apartment on the afternoon of October 5, the defendant, the victim, and the Jones children were present. When she returned between 12:30 and 1:30 a.m., she found only the defendant there. Blood stained the defendant's white trousers and a sheet and pillow case on the couch Ms. Jones used for her bed. The defendant told Ms. Jones that a friend had told him that the victim and Ms. Jones' brother "must have been fighting again".

At approximately 3 a.m., Ms. Jones and the defendant searched an alley behind the apartment building, finding nothing. At 7 a.m., others found Ms. Smith's body in the alley near a shed or blockhouse in the area Ms. Jones and the defendant had searched earlier. Searching Ms. Jones' apartment, the police found a pair of tennis shoes belonging to the defendant. There were blood spots on them, with fresh paint laid over the spots.

Mr. Nash, an acquaintance of the defendant and Ms. Jones, testified that he had visited the apart-ment on the evening of the 5th of October and had left at 9 or 10 p.m., with the defendant, the victim, and the children there.

Another acquaintance of the defendant stated

that at 11:30 p.m. she had heard screams in the alley behind the apartment building and saw a man resembling Nash struggling with a woman. Standing nearby was a second man who stood in a manner resembling the defendant and who wore a hat like the one she knew the defendant to have. An automobile she recognized as belonging to Nash was near by, its lights on. She recognized the woman's voice as that of Ms. Smith.

A neighbor testified that at approximately 1:50 a.m., he heard a car pull into the alley and leave a few minutes later. Soon thereafter, he heard a female quarreling in the alley with a man whose voice he recognized as that of the defendant.

The body of the victim was bloody and showed signs of a beating. It was dressed only in a blouse; in the nearby blockhouse was a large quantity of blood together with slacks, underwear, and one shoe belonging to the victim. The cause of death was multiple blunt wounds to the head.

The defendant is one of that 20% of the population who are "nonsecretors", whose blood type cannot be discovered from analysis of other bodily fluids. The victim's blood type was B; that of the defendant is O. Seminal fluid found on the bloodied bed sheet in the Jones' apartment was found to be that of a nonsecretor. The blood found on the sheet, the pillow case, the defendant's trousers and shoes, on the victim's jacket, on a newspaper from the blockhouse, and on a vaginal swab taken from the victim was found to be type B. Microsperm found on the swab were apparently not tested for secretor grouping.

A Mr. Jones, a companion of the victim, testified that he had had sexual intercourse with the victim one or two days before her death. The testimony suggested that the microsperm found in the vic-

tim's body had been present for no more than 36 hours.

The defendant testified that on the evening of October 5th, he had gone drinking and gambling and, after delivering Ms. Jones' children to their grandmother's home, had become involved in a "struggle" with another gambler, suffering scratches on his knees, arms, and wrists. He stated that Ms. Smith had had a nose bleed on the night of October 5, soiling the apartment and his clothing with blood. Later in the evening, he said, he had painted the number on the apartment door, deliberately painting his shoes in the process because that was a "habit" he had in his trade as a painter.

The defendant's first claim on appeal asserts that his conviction of felony murder is inconsistent with his acquittal of first-degree criminal sexual conduct and, so, must be reversed.

As a general proposition, courts do not interfere with a jury's power to believe or disbelieve any part of the evidence presented to it. *People v Fuller,* 395 Mich 451; 236 NW2d 58 (1975). However, inconsistent verdicts raise a special and difficult problem for they evidence either a significant misunderstanding of the law set forth in jury instructions or an unresolved matter of fact and perhaps a lack of the unanimity required of jury verdicts. Thus, this Court has repeatedly held in criminal cases that verdicts that cannot be reconciled on any rational basis cannot stand. *People v Hager,* 72 Mich App 664; 250 NW2d 754 (1976), *People v Goodchild,* 68 Mich App 226; 242 NW2d 465 (1976).

We agree that a felony murder conviction based on a completed act of criminal sexual conduct cannot stand together with a verdict of not guilty

of the same criminal sexual conduct charged in another count. The prosecution, however, posits a jury finding in this case that the defendant never completed the charged criminal sexual conduct and claims that this possibility is sufficient to reconcile the verdicts. The felony murder statute, MCL 750.316; MSA 28.548, provides for conviction of first-degree murder where murder arises out of an *attempt* to commit one of the felonies listed therein.

We find that one insurmountable obstacle stands in the way of the prosecution's reasoning. While the jury in this case was instructed that an attempt to commit the charged criminal sexual conduct could support a verdict of guilty of first-degree murder, it was never instructed in the law of attempt. If the jury indeed concluded that the defendant merely attempted to commit a sexual assault on the victim, it did so improperly, for to do so it necessarily had to generate its own definition of a criminal attempt. In keeping with the principle that criminal statutes are to be narrowly construed, the "attempt" to which the felony murder statute refers cannot consist of what any single jury may consider to be a sincere try, but must be a legally culpable attempt, defined by statute and case law. See MCL 750.92; MSA 28.287, *People v Gardner,* 13 Mich App 16; 163 NW2d 668 (1968).

To allow a felony murder conviction upon a finding of an attempt to commit one of the enumerated felonies, an instruction in the nature of CJI 9:1:01 must be given. Without such an instruction, the underlying crime of attempted criminal sexual conduct is removed from the jury's consideration, see *People v Henry,* 395 Mich 367, 373; 236 NW2d 489 (1975), and no murder conviction

may be based thereon. The conviction of first-degree felony murder must, therefore, be vacated.

The trial court gave proper instructions on the crime of second-degree murder. Thus, whatever misunderstanding afflicted the jury as to the criminal sexual conduct charges, it necessarily found the defendant guilty of this offense. On remand, judgment of guilty of second-degree murder shall be entered, and the defendant resentenced. The prosecutor has the option to retry the defendant on the first-degree murder charge, if he should determine that justice would be better served thereby. *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971). Of course, the defendant may not be retried on the charge of criminal sexual conduct in the first degree.

Throughout the preceding discussion, we have treated as proper the trial court's assumption that criminal sexual conduct in the first degree is the equivalent of rape for purposes of felony murder prosecution. As this might be the case if the prosecutor decides to retry the defendant, some comment is in order. In its charge to the jury, the trial court set out a partially reduced definition of the crime of criminal sexual conduct in the first degree:

"First of all, in regard to Felony Murder, the Defendant is charged with the crime of Murder of the First Degree. The law, as it applies to this case, states that all murder which shall be committed during and as a result of the committing or attempting to commit rape shall be Murder of the First Degree. The Defendant pleads not guilty.

"There are two kinds of murder, first degree and second degree, and you will be instructed as to both. Murder of either degree is the killing of one person by another with malice. Malice is a term with special meaning in the law. Malice means that the Defendant

intended to kill or that he knowingly created a very high risk of death with knowledge that it probably would result in death, and that he did so under circumstances which did not justify, excuse or lessen the crime.

"First Degree and Second Degree Murder are the same crime, except that First Degree Murder has one more element. The additional element is that the death must have occurred as a direct result of the commission of the crime of rape.

"You will first be instructed on Murder of the Second Degree. Keep in mind that all of the elements of Second Degree Murder are necessary to prove First Degree Murder.

"To establish Second Degree Murder, the Prosecution must prove each of the following elements beyond a reasonable doubt:

"First, that the deceased died on or about October the 6th, 1978 within the County of Wayne in the City of Detroit.

"Second, that her death was caused by an act of the Defendant or because the Defendant consciously created a very high degree of risk of death to another with the knowledge that it probably would cause death.

"Third, if you find that the death was caused by the Defendant, you must determine whether the Defendant is guilty of any crimes. The killing of one human being by another may be entirely innocent. It is not the act of killing in itself which makes it a crime, but the state of mind with which it is done.

"You must—fourth, for murder you must find the Defendant consciously and knowingly performed the act which caused death. The Defendant must have either intended to kill, that is, he must have done the act intending that it result in death or in great and serious bodily injury, or he must have knowingly created a very high risk of death with the knowledge that it probably would cause death.

"The degree of risk for murder must be so reckless and wrong[f]ul as to amount to a criminal purpose aimed against a person's life, and the Defendant must have been conscious of that risk.

"For Murder of the First Degree, the Prosecutor must prove beyond a reasonable doubt the four elements of Second Degree Murder which have been described to you. In addition, he must prove beyond a reasonable doubt the fifth element, which raises the crime to First Degree Murder.

"Fifth, that at the time of the act which caused the death of Etta Mae Smith, the Defendant was committing or attempting to commit or assisting another in the commission of the crime of rape, as it should be known, as Criminal Sexual Conduct in the First Degree. For the crime of Criminal Sexual Conduct in the First Degree, the Prosecution must prove each of the following elements beyond a reasonable doubt:

"First, that the Defendant engaged in a sexual act which involved some actual entry into the genital or anal openings of the complainant's body. It is alleged in this case that the sexual act was committed by a penetration of the complainant's body by the Defendant's penis. Any such entry into the anal or genital openings is enough. It is not necessary that there be a completed sexual act or the emission of semen.

"Second, that the Defendant caused personal injury to the complainant.

"Personal injury means bodily injury. It also includes any disfigurement, chronic pain, pregnancy, disease, loss or impairment of the sexual or reproductive organ, or mental anguish. Mental anguish means suffering which occurs at the time of the alleged act.

"Third, that the Defendant used force or coercion to commit the sexual act. The term "force or coercion" means the use of actual physical force by the Defendant or any action or threat sufficient to create a reasonable fear of dangerous consequences.

"It is sufficient force if the Defendant overcame the complainant through the actual application of physical force or physical violence.

"If you find the Defendant guilty of murder, it is your duty to state in your verdict whether he is guilty of Murder of the First Degree or guilty of the lesser offense of Murder of the Second Degree."

The difference between the possible crimes falling within this instruction and the common law crime of rape is apparent.

At the time of the offense, criminal sexual conduct in the first degree was not one of the felonies upon which a felony murder conviction could be built.[1] In *People v McDonald,* 86 Mich App 5; 272 NW2d 179 (1978), this Court described the distinction between the common law offense of rape and the range of offenses punishable as criminal sexual conduct in the first degree, maintaining that the Legislature did not intend to eliminate the offense of murder in the perpetration of rape by enacting the more comprehensive scheme and holding that murder in the perpetration of a common law rape remained a viable crime. We agree with that conclusion. However, we cannot hold that the criminal sexual conduct statute, standing alone, broadened the class of crimes that can support a felony murder conviction. Thus, in offenses committed before the effective date of 1980 PA 28, only instructions on the common law crime of rape may be given when a felony murder charge is built upon a sexual assault.

Among the circumstantial evidence connecting the defendant to the death of Ms. Smith was seminal fluid found on the bloodied bed sheet in the Jones apartment. Analysis proved this material to be the product of a "nonsecretor" male. The defendant, like 20% of the population at large, is a nonsecretor. The defendant urges us to follow the lead of *People v Sturdivant,* 91 Mich App 128; 283 NW2d 669 (1979), in which such evidence was held to be improper. We decline to do so.

[1] The Legislature has acted to bring criminal sexual conduct in the first and third degrees within the ambit of the felony murder statute. 1980 PA 28, MCL 750.316; MSA 28.548, effective March 7, 1980. That amendment does not affect the case at bar.

The overwhelming majority of courts allow the use of blood grouping evidence in criminal trials, both to connect victims with defendants and, of interest here, to show that defendants could have left blood stains on crime scenes. See, *e.g., People v Vallez,* 80 Cal App 3d 46; 143 Cal Rptr 914 (1978), *People v Gillespie,* 24 Ill App 3d 567; 321 NE2d 398 (1974), *State v Thomas,* 78 Ariz 52; 275 P2d 408 (1954), *Commonwealth v Statti,* 166 Pa Super 577; 73 A2d 688 (1950), and *Shanks v State,* 185 Md 437; 45 A2d 85 (1945). See also Anno: *Blood grouping tests,* 46 ALR2d 1000. New York has adopted the position that such evidence is without probative value and is, thus, inadmissible. *People v Robinson,* 27 NY2d 864; 317 NYS2d 19; 265 NE2d 543 (1970).

*Sturdivant* based its decision on the provisions of the paternity act, MCL 722.716; MSA 25.496, banning the use of this sort of evidence in paternity proceedings except to protect a putative father. We do not find this reasoning persuasive. Whatever legislative policies and considerations might have led to this rule do not affect the practices of our Court in criminal proceedings. The Legislature might have sought to suppress blood grouping evidence in all litigation but did not do so, indicating that the focus of this rule is the type of proceedings involved rather than blood group evidence generally. As the California court remarked in *Vallez, supra,* the restriction on blood group evidence in paternity proceedings must be viewed as "unique".

Neither are we persuaded by the *Sturdivant* opinion's attempt to distinguish *Gillespie, supra,* from its own case which, like the case at bar, involved a showing that one of the population of "nonsecretors" was connected with a crime. In

*Gillespie,* evidence was admitted to show that a burglary was committed by a person having blood characteristics occurring in only 2.7% of the black population. The panel in *Sturdivant* considered that the great "specificity" of the evidence in *Gillespie* distinguished it from the 80%/20% grouping shown by the secretor characteristic.

If established data such as this is to be used at all, we believe that the statistics themselves are of no significance. As the population group connected with a crime grows larger, the probative force of that connection will decrease accordingly. As observed in *Thomas, supra:*

"To exclude evidence merely because it tends to establish a possibility, rather than a probability, would produce curious results not heretofore thought of." 78 Ariz 52, 64.

We conclude that deposits of blood and other identifiable bodily substances do not differ from other pieces of physical evidence such as clothing, hair styles, physical stature, or other observations that show possible connections between defendants and criminal acts. The weight of such evidence is for the jury's determination.

The conviction of first-degree murder is reversed, and the cause remanded for proceedings not inconsistent with this opinion.