THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MONTGOMERY ANGELLY, Defendant-Appellant.

Fifth District   No. 5—86—0690

Opinion filed March 31, 1988.

Robert H. Rath, of Rath & Fornes, of Harrisburg, for appellant.

David W. Hauptmann, State's Attorney, of Harrisburg (Stephen E. Norris and Kim G. Noffke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Defendant, Montgomery Angelly, was convicted by a jury of attempted murder, armed violence, aggravated battery, armed robbery, and theft. The circuit court of Saline County entered judgment only on the attempted murder and armed robbery verdicts, sentencing defendant to 30 years' imprisonment on each, to be served concurrently. The court further ordered defendant to pay costs and restitution of $10,000. We affirm the judgment of the circuit court.

During the evening of October 28, 1985, at approximately 6:30 p.m., the victim, Lee Wilson, ran into defendant, a longtime acquaint-

ance, at the Eagles Club in Harrisburg, Illinois. The two sat at the bar and talked and drank beer until sometime between 9:30 and 10 p.m. Wilson asked defendant to give him a ride to the Uptown Motel so he could get a room and pick up the key before the office closed. Defendant drove Wilson to the motel in his car, a white Ford with military reserve plates. They then got something to eat and returned to the Eagles, where they drank until closing at 12:30 a.m.

After the Eagles closed, the two men decided to get more beer. They drove in defendant's car to a liquor store, then to another tavern, both of which were closed. They proceeded to defendant's house in Carrier Mills. Defendant went inside and returned with a couple of cans of Busch beer. Defendant then drove back to Harrisburg and out to some mine property which his brother owned. There the two talked and drank until the beer was gone. They drove back to defendant's house to get more beer. Defendant went inside and returned with a 12-pack of beer and some food. They then drove back out to the mine because defendant told Wilson he needed to pick up some money he had hidden there. Defendant stopped at a metal shed where the money was supposedly hidden. The two men went inside to get the money. Because it was too dark, Wilson returned to defendant's car to get some matches. As he came around the side of the car, Wilson found defendant facing him with a gun. Defendant stated he had to have Wilson's money and then began shooting. Wilson pleaded with defendant to stop while he tried to dodge the bullets. Wilson received four gunshot wounds before defendant ran out of bullets. Wilson told defendant it was not worth it and started praying. Defendant again asked Wilson for his money. Wilson reached in his pocket and handed over $900. Wilson asked defendant to take him to a hospital. Defendant answered, "One part of me wants to and the other part won't let me." Defendant then gave Wilson a beer.

Several hours went by during which Wilson kept talking to defendant about their being friends and how he would not tell anyone defendant shot him. By this time trucks started driving down the road by the mine. After they passed, defendant helped Wilson to the car. Defendant then drove toward Pankeyville. Upon coming to a wooden bridge in the area, defendant stopped the car and ordered Wilson to get out. Defendant further informed Wilson he would kill him if he told anyone about the shooting. Defendant got back in the car and drove off the way they had come.

Wilson started walking until he came upon a residence. Because dogs started barking, the woman living there came out to investigate. Wilson told her he had been shot and needed help. After the woman

verified he had been shot, she drove him to Harrisburg Medical Center. On the way to the hospital, Wilson initially told her he had been robbed and shot by several blacks. He later told her defendant, or as she understood it, Monty English, shot him. Wilson also described to her defendant's car. At the hospital, Wilson first refused to tell the police who shot him, but eventually stated defendant had shot and robbed him of $900 about 1:30 in the morning. Wilson had bullet wounds to the chest, right hand, right forearm and liver, all of which the examining physician believed to be fresh.

The police arrested defendant that morning, and after searching his house, found a pair of jeans with blood on them in a clothes dryer, boots with blood on them in the garage, and a .38 caliber revolver and five discharged cartridge casings in a dresser drawer. Defendant's car had blood on the right front passenger seat and armrest and on the driver's door. At the mine site, the police found a Busch beer can sitting on a stool inside a shed and some matchbooks. The site was not otherwise processed because it had been raining all day. A forensic scientist testified the blood found on the various items could have come from Wilson, but not from defendant.

Defendant testified he and Wilson were drinking at the Eagles Club that evening. His version of the events up until the time the Eagles closed parallels Wilson's. It is after they left the Eagles for the second time that their stories differ. Defendant claims he simply dropped Wilson off outside his motel. He then proceeded home, arriving around 12:30 a.m., got something to eat and went to bed. The next thing he knew he was awakened by the police in the morning. Defendant consistently denied any involvement in the shooting or robbery. The jury, however, found defendant guilty on all counts.

Defendant raises 12 issues on appeal, primarily pertaining to three areas: the State's expert testimony, the prosecutor's closing argument, and his sentence. None of the alleged errors, if errors at all, require reversal in this instance.

■■ ■ Defendant first argues the testimony pertaining to the forensic testing of bloodstains found on his car and clothing should not have been allowed. Defendant argues the foundation for the analysis evidence was insufficient to establish the reliability of the method used. We disagree.

The forensic scientist called by the State testified to his conclusions drawn from two methods of analyzing blood—ABO group testing and electrophoresis. Defendant recognizes the acceptance by our courts of the reliability of the ABO system (see, e.g., *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 573, 321 N.E.2d 398, 402), and

defendant concedes electrophoresis testing is not unreliable as a matter of law (see *People v. Redman* (1985), 135 Ill. App. 3d 534, 539, 481 N.E.2d 1272, 1276). Rather, defendant attacks the foundation laid in this instance to present such testimony.

The scientist testified that electrophoresis is commonly used by crime labs across the country and accepted as reliable in the scientific community. He knew of only one authority who disputed the method's accuracy. He also explained the principles behind the technique and his own experience and training in the field. This foundation testimony was more than sufficient to support the admissibility of his conclusions. (See *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 626, 414 N.E.2d 1318, 1322, *cert. denied* (1981), 454 U.S. 849, 70 L. Ed. 2d 138, 102 S. Ct. 170. See also *People v. Knox* (1984), 121 Ill. App. 3d 579, 583-84, 459 N.E.2d 1077, 1080-81; *People v. Bush* (1981), 103 Ill. App. 3d 5, 13-14, 430 N.E.2d 514, 520-21.) In addition, because an expert is not required to divulge the facts or data he considered before being allowed to state his opinion, the trial court did not err in allowing the State to elicit additional foundation testimony after the expert had testified to his conclusions. Any deficiencies in the development of his testimony pertaining to the test procedures employed and other such matters were the responsibility of defendant to pursue. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193-94, 417 N.E.2d 1322, 1326-27, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140; *People v. Whitfield* (1986), 140 Ill. App. 3d 433, 438, 488 N.E.2d 1087, 1090-91. See also *Gillespie*, 24 Ill. App. 3d at 577, 321 N.E.2d at 405.

■ Ignoring the electrophoresis results for the moment, the expert was able to identify one bloodstain in defendant's car using the ABO blood-grouping system. This test, too, revealed that the blood could have come from Wilson but not from defendant. More importantly, all of the bloodstains were determined to be of human origin, an incriminating fact in and of itself. Lastly, no testimony regarding statistical probabilities linking defendant to the crime was given. (*Cf. People v. Harbold* (1984), 124 Ill. App. 3d 363, 383, 464 N.E.2d 734, 749.) We therefore find no error in the trial court's admitting into evidence the forensic scientist's testimony pertaining to blood-testing. See *Redman*, 135 Ill. App. 3d at 539, 481 N.E.2d at 1276.

■ Defendant next argues the trial court should not have admitted into evidence over his objection the boots of defendant and of Wilson when the same forensic scientist could not identify which pair exhibited bloodstains. Again, we must disagree with defendant's position.

At trial, two pairs of boots were admitted into evidence. People's exhibit No. 8 was identified as being the boots worn by Wilson, while

people's exhibit No. 15 was identified as being those of defendant. The crime scene technician who retrieved the brown workboots from defendant's garage (exhibit No. 15) testified they appeared to have blood on them. The forensic scientist who later examined the boots for blood reassigned his own numbers to the items and apparently confused the two pairs. After extensive questioning and many objections, the scientist ultimately stated he found human blood present on the brown workboots associated with defendant. The trial court found that any confusion resulting from his testimony worked to defendant's benefit and that both counsel would have the opportunity to argue the matter to the jury. The court further noted that any contradictions in the scientist's testimony presented a question for the jury to decide. Finally, any confusion regarding whether the bloodstained boots belonged to Wilson or defendant was resolved when defendant admitted they were his. We find no error in the admission of this evidence.

Defendant also raises an issue pertaining to the admission into evidence of a bullet fragment removed from Wilson's hand. We choose not to address this matter because defendant obviously has abandoned the point by not addressing it in his brief.

Defendant's next set of contentions pertains to the prosecutor's closing argument. Defendant argues it was improper for the prosecutor to comment on defendant's failure to call certain witnesses, to argue to the jury that if defendant were not guilty the State would not have prosecuted him, and to advise the jury Wilson's testimony was not impeached when in fact it was. Defendant misperceives the prosecutor's closing argument in its entirety. In each instance, the complained-of remarks were either taken out of context, invited by defense counsel, or, quite simply, proper, whether or not defendant believes them to be so.

To warrant reversal, complained-of remarks made by a prosecutor must have constituted a material factor in the defendant's conviction, resulted in substantial prejudice to the defendant or produced a judgment different from that which would have resulted had the improper argument not been made. (*Whitfield*, 140 Ill. App. 3d at 441, 488 N.E.2d at 1092; *People v. Jones* (1982), 108 Ill. App. 3d 880, 887, 439 N.E.2d 1011, 1017.) In making such a determination, we, as a reviewing court, must look to the content of the language used in relation to the evidence, as well as the effect of the argument on the rights of the defendant to a fair and impartial trial. *Jones*, 108 Ill. App. 3d at 887, 439 N.E.2d at 1017; *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68, 76.

Defendant first argues the prosecutor's statement that "[w]e

do not go out and hang people" implied to the jury that charges would not have been brought against him unless he were guilty. The statement, however, is taken out of context. The prosecutor was not commenting on defendant's being charged with the crimes but rather on the system of trial by jury in general. In context, the prosecutor's comments read:

"As I stated earlier in opening statements everyone has a right to a trial, everyone has a right to an attorney, to cross examine the witnesses and present their witnesses. This is the American system. We through the State's Attorney's office charges [sic] somebody with a crime and that individual has the right to trial. We have to show beyond a reasonable doubt that he did or she did what they were charged with. This was conducted with judicial integrity. We try to be refined, we try to be gentlemen and conduct ourselves within the norms of the law. We try to do the best of our abilities. We do not go out and hang people."

We find no error when looking at the argument as a whole.

Defendant next makes numerous references to the prosecutor's arguments that he claims are comments on his failure to call certain witnesses to testify at his trial. We recognize that a prosecutor may not make comments designed to destroy the presumption of innocence and impose a heavier burden on defendant than does the law. (See *Harbold*, 124 Ill. App. 3d at 372, 464 N.E.2d at 742; *Jones*, 108 Ill. App. 3d at 887, 439 N.E.2d at 1017; *People v. Nodal* (1980), 89 Ill. App. 3d 538, 541, 411 N.E.2d 1087, 1090.) This does not mean, however, that the prosecutor cannot make arguments based upon the facts in evidence and legitimate inferences which may be drawn therefrom. See, *e.g.*, *Jones*, 108 Ill. App. 3d at 888, 439 N.E.2d at 1017-18.

Defendant testified at trial but did not address several areas of incriminating evidence, such as the jeans found in his dryer, stained with blood consistent with the victim's blood type but not with his own. No other defense witnesses supplied reasons for the presence of blood in defendant's car or on his clothing. Defense counsel objected to comments made by the prosecutor that no explanations were given for such evidence. The court reminded the jury defendant was not required to prove his innocence, an instruction which was reiterated just prior to deliberations. Therefore, even if such remarks based on the evidence were improper, any error was rendered harmless by the court's admonitions. (*Whitfield*, 140 Ill. App. 3d at 440-41, 488 N.E.2d at 1092; *People v. Lilly* (1985), 139 Ill. App. 3d 275, 288, 487 N.E.2d 414, 423.) Other comments pertaining to defendant's failure to call wit-

nesses were made in rebuttal and invited by defense counsel's arguments, as were the prosecutor's remarks made in response to being characterized as an advocate for Wilson. Defendant has no standing to complain in such instances. *E.g.*, *Nodal*, 89 Ill. App. 3d at 540, 411 N.E.2d at 1089.

■ Defendant's final attack on the prosecutor's closing argument centers on the credibility of Wilson. Defendant contends it was improper for the prosecutor to advise the jury that Wilson's testimony had not been impeached when the record reveals otherwise. The record, however, does not reveal otherwise. It is true that some inconsistencies did surface, but all were of a minor and inconsequential nature. None rose to the level of impeachment. For example, defendant points to Wilson's refusal to tell the police the name of his assailant when first questioned. After further pressing, Wilson later revealed that it was defendant, just as he had with the woman who drove him to the hospital. He explained that defendant had threatened to finish him off if he told anyone who had shot him. Wilson's initial reluctance to identify defendant as his assailant is certainly understandable.

Defendant also points to Wilson's failure to remember telling the police in the emergency room what time he was shot and how many times he went to the mine site that evening. It must be remembered, however, that Wilson had been shot several times and denied assistance for many hours. He testified that medical personnel were trying to keep him from going into shock when he arrived at the hospital. Wilson's "lapse of memory" is easily explained in view of such extreme trauma.

Finally, defendant claims Wilson was impeached by the fact that he told police officers he had been robbed and then shot when at trial Wilson testified he was shot and then robbed. This inconsistency was not generated by any witness' articulation of the sequence of events, however. Defense counsel, in cross-examining one of the witnesses, reversed the order of events by asking, "Isn't it true *** that Mr. Wilson stated he had been robbed by Angelly of nine hundred dollars and then shot?" The witness merely responded in the affirmative. Such inconsistency has little significance in view of the rest of his testimony, as well as that of other witnesses. In summary, Wilson's testimony was essentially uncontradicted, and the prosecutor committed no error in so arguing to the jury.

■ It must be remembered the existence of conflicting evidence is insufficient grounds for reversal of the findings of the trier of fact. (*E.g.*, *People v. Leckrone* (1985), 134 Ill. App. 3d 978, 981, 481 N.E.2d 343, 345.) And, we, as a reviewing court, will not substitute our judg-

ment for that of the trier of fact on questions involving the credibility of witnesses and the weight of the evidence. (*E.g., Lilly,* 139 Ill. App. 3d at 282, 487 N.E.2d at 419; *People v. Gruner* (1985), 130 Ill. App. 3d 1042, 1049, 474 N.E.2d 1355, 1360.) In other words, we will not set aside a criminal conviction unless the evidence is so improbable, unreasonable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. (*E.g., Lilly,* 139 Ill. App. 3d at 281, 487 N.E.2d at 419; *Leckrone,* 134 Ill. App. 3d at 981, 481 N.E.2d at 345.) Such is not the case here.

We turn now to defendant's final area of contention—his sentence. Defendant argues the court considered improper factors in arriving at his sentence, including his failure to make a statement in his own behalf or to show remorse at the sentencing hearing; improperly sentenced him for two offenses arising from the same act or conduct; and abused its discretion in applying extended-term provisions while failing to consider his rehabilitative potential. We find defendant's sentences to be properly imposed.

■■■ Defendant claims he is entitled to vacation of his armed robbery conviction on the basis that the acts supporting that conviction are included in the conduct which supports his attempted murder conviction. It is true that where more than one offense is carved from the same physical act, vacation of the less serious offense is required. (See *People v. Hefley* (1982), 109 Ill. App. 3d 74, 77, 440 N.E.2d 173, 176.) Multiple convictions and concurrent sentences are permitted, however, where the defendant has committed several acts, despite the interrelationship of the acts, provided the offenses are not by definition lesser included offenses. (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.) Armed robbery is not a lesser included offense of attempted murder. (See *Hefley,* 109 Ill. App. 3d at 77-78, 440 N.E.2d at 176.) Attempted murder and armed robbery are separate, distinct crimes based upon separate acts, each requiring proof of different elements. (*People v. DeSimone* (1982), 108 Ill. App. 3d 1015, 1022, 439 N.E.2d 1311, 1315. See also *People v. Camacho* (1979), 71 Ill. App. 3d 943, 956, 389 N.E.2d 1213, 1222.) Here, the taking of money was a separate act necessary to support the armed robbery conviction, whereas the shooting alone was sufficient to support the attempted murder conviction. We find no reason to vacate defendant's armed robbery conviction in this instance.

■■■ Defendant next argues his conduct was not exceptionally brutal or heinous to justify the sentence imposed. Defendant fails to remember he repeatedly shot Wilson, a longtime acquaintance, without

even giving him a chance to hand over his money. He kept Wilson from medical attention for hours while Wilson repeatedly begged for mercy and then dropped him off in an isolated area with little chance for getting help. He informed Wilson that if he told anyone who shot him, he would make sure to kill him the next time. Such facts clearly justify the court's determination. Nor does it matter, if such were the case, that the court first determined whether defendant was eligible for extended-term provisions and then examined factors in aggravation and mitigation, as opposed to doing it in the reverse order. See *People v. Butts* (1985), 135 Ill. App. 3d 132, 134-35, 481 N.E.2d 987, 989. *Cf. People v. Killen* (1982), 106 Ill. App. 3d 65, 67, 435 N.E.2d 789, 790.

■■ We also find little merit to defendant's complaints that the trial court failed to consider his rehabilitative potential while improperly considering his lack of remorse at the sentencing hearing. Defendant's presentence report indicated that he repeatedly drove by Wilson's home before the trial in an effort to harass and intimidate him. Such actions do not ring of rehabilitative potential. More importantly, the court had the opportunity to observe defendant throughout the trial and sentencing proceedings. That same court obviously was in the best position to impose a proper sentence. (*E.g., People v. Deacon* (1985), 130 Ill. App. 3d 280, 295, 473 N.E.2d 1354, 1365, *cert. denied* (1985), 474 U.S. 921, 88 L. Ed. 2d 260, 106 S. Ct. 253.) Absent a clear abuse of discretion, we will not substitute our judgment for that of the sentencing court. See, *e.g., People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884; *Leckrone*, 134 Ill. App. 3d at 982-83, 481 N.E.2d at 346-47.

■■ Finally, while the court did note in passing that defendant exhibited precious little remorse, reliance on such an improper factor does not necessarily necessitate remandment for resentencing. (See *People v. Bourke* (1983), 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340.) Based on the record before us, the court obviously did not place any significant weight on this factor so as to impose a greater sentence on defendant. Remandment, therefore, is not required. 96 Ill. 2d at 332, 449 N.E.2d at 1340. See also *Leckrone*, 134 Ill. App. 3d at 983, 481 N.E.2d at 347.

For the reasons stated above, we affirm the judgment of the circuit court of Saline County.

Affirmed.

HARRISON, P.J., and WELCH, J., concur.