THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL DEACON, Defendant-Appellant.

Second District   No. 83—421

Opinion filed January 28, 1985.

Thomas E. Callum, of Callum, Anderson & Deitsch, of Wheaton, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

Following a jury trial, the defendant, Michael Deacon, was convicted of the murder of George Christo, Jr. The defendant was subsequently sentenced to a 55-year term of imprisonment. He appeals, raising numerous contentions of error involving the pretrial, trial, and sentencing stages of the proceedings below.

The defendant was tried together with Leonard Stocki, who also was charged with Christo's murder. At the trial the State presented one occurrence witness, Lois Chernetzki, the girlfriend of the decedent. She had previously been convicted of delivery of a controlled substance, *i.e.*, "speed," and delivery of cannabis.

Chernetzki testified that Christo's nickname was "Bear." She stated that at around 9:30 p.m. on June 11, 1982, she was with Bear and several other friends at Lujack's Pub. They were drinking and watching a boxing match on television. At about 11 p.m. they left and went to a tavern in Bloomingdale called the Bigger Jigger where they continued to drink. Chernetzki said that the Bigger Jigger was pretty crowded with both "regular people" and with "bikers" wearing the colors of the Hell's Henchmen motorcycle club. Colors are patches stating the club name and are generally worn on the back of a jacket.

Chernetzki, her friend Kathy Hadamik, and Bear decided to leave at about 1:15 a.m. They walked to the back of the bar, and Bear asked Chernetzki and Hadamik to wait there for him. He walked out the back door, and Chernetzki and Hadamik waited in the bar. After a few minutes they walked out the back door. Chernetzki testified that she saw Bear in the parking lot talking to Leonard Stocki, who was wearing the Henchmen colors. She went to her car, along with Hadamik, where they waited. After a few minutes, Chernetzki pulled her car up next to where Bear and Stocki were talking. Bear and Stocki then walked back into the tavern through the back door.

Chernetzki testified that she then drove her car forward about a

car length so traffic could get by. After about 10 minutes she saw Bear in her rear-view mirror walking toward where her car had been parked. She honked her horn, and Bear turned around and began walking toward her car. Chernetzki testified that she then heard what sounded like a bottle breaking on the passenger side of her car, toward the rear. She then heard a thump near the front and saw Bear rolling off of the front of her car.

Chernetzki testified that she backed her car up about a car length and saw several individuals, including Stocki and J. J. McClellan, standing around and kicking Bear. Finally, McClellan said that Bear had had enough and told Chernetzki to get him out of the area. Chernetzki and Hadamik then helped Bear up by placing his arms around their shoulders. Stocki left at this point.

While Chernetzki and Hadamik were walking Bear to the car, Brad Olson exited the bar, kicked him out of their arms, and continued to kick him as he lay on the ground. According to Chernetzki, at that point the defendant came out of the bar and kicked Bear one time in the back of the head. By that point Bear was no longer trying to protect himself. The defendant was wearing Henchman colors and black motorcycle boots. After the one kick the defendant walked back towards the bar.

McClellan then "somersaulted" Bear into the back seat of Chernetzki's car, and Chernetzki drove to a home in Schaumburg, where paramedics were summoned. Bear was alive during the drive to Schaumburg but was having difficulty breathing. One of the paramedics testified that when he arrived a short time later, Christo was dead.

Officer Roy Derby of the Bloomingdale police department testified concerning an interview he had with the defendant in a jail in North Carolina approximately two weeks after the occurrence. According to Derby, the defendant told him that on the night in question he had had only one beer because he had taken some speed earlier. At some point during the night he walked outside of the bar with Jerry Bokina and saw a fight going on next to the tavern. The defendant walked over to see what was going on. A bunch of guys were standing around another guy who was lying on the ground. According to Derby, the defendant said that somebody at the scene told him that the guy on the ground "had called him Henchkids." The defendant said he then walked over, stomped on the guy's head, and walked away.

A written statement the defendant gave to Derby was also admitted into evidence. It was similar to the defendant's oral statement,

but added the fact that when he left the scene, other people were still punching and kicking the guy on the ground.

Officer Derby also testified about a statement made by Stocki, but the jury was instructed not to consider it against the defendant.

Dr. Robert Stein, the chief medical examiner of Cook County, who performed an autopsy on the body of the decedent, testified that death was caused by multiple injuries of blunt trauma.

The State also presented evidence about blood found on the defendant's motorcycle boots. The boots were obtained from his property box at the Du Page County jail while he was awaiting trial. Judie Welch, a forensic scientist with the Illinois Department of Law Enforcement, testified that there was type A blood on Deacon's boots. Both Christo and Deacon had type A blood. Stocki's blood was type O. Welch stated that 40% of the Caucasian population has type A blood. She also testified that certain blood found on the parking lot of the Bigger Jigger after the incident was type A. The PGM type of that blood, however, was consistent with that of Christo and inconsistent with that of the defendant.

The defense presented the testimony of two occurrence witnesses, Kathy Hadamik and Jerome Bokina. Hadamik was not available to testify in person, so her testimony from a preliminary hearing and from Olson's trial was read by a court reporter.

Hadamik's testimony was substantially similar to Chernetzki's up to the point that the women picked Bear up from the parking lot. Hadamik stated that she did not think that someone kicked Bear out of their arms, but that Bear just collapsed. Then the women got one of the men at the scene to help them put Christo in Chernetzki's car, and they left the scene.

Jerry Bokina was another member of the motorcycle club. He was at the Bigger Jigger on the night in question. He testified that at about 1:30 a.m. he walked out of the front door of the bar and heard somebody yelling. He walked around to the side of the building and saw two people arguing. Bokina testified that one of the two people, subsequently identified as Brad Olson, hit the other guy (Christo) four or five times. The force of the blows propelled Christo into a dark area near the building, and Olson followed. Christo fell to the ground, and Chernetzki's car pulled up. The two women got out of the car and started yelling.

Bokina testified that he then went back into the bar because he did not want to get involved. He saw the defendant inside the front part of the bar and told him that there was a fight going on outside. Bokina subsequently left the Bigger Jigger, along with the defendant,

Stocki and David Stone. In the meantime, Bokina never saw the defendant leave the bar, although Bokina did not spend that time with him, nor did he try to keep track of the defendant's movements.

Following presentation of the evidence and the closing arguments, the jury was instructed. Instructions were given concerning the charged offense of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)), and the lesser included offenses of involuntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—3), aggravated battery and battery.

During its deliberations the jury sent the judge the following question:

> "If charged with murder, does that mean a defendant is automatically guilty of the three other offenses listed, including involuntary manslaughter, aggravated battery, and battery? Or is each determined independently of the others?"

Because of the ambiguity of this note, the judge sent the jury a request for clarification of the question. The jury then reworded its question as follows, "Can a defendant be found guilty of murder but not guilty of involuntary manslaughter?" After some discussion with counsel, the judge answered this question with a simple yes.

The jury subsequently returned its verdicts in open court, and the judge immediately made the following statement:

> "Ladies and gentlemen, you have signed what I consider to be legally and factually inconsistent verdicts. In your verdicts you have found Michael Deacon and Leonard Stocki to be guilty of both murder and involuntary manslaughter. It is an either/or proposition. Either the Defendants are guilty of murder or they are guilty of involuntary manslaughter. To be guilty of involuntary manslaughter, they must have acted recklessly. To be guilty of murder, they must have acted intentionally or with knowledge.
>
> These are legally and factually inconsistent verdicts, so I am going to send you back to deliberate and reconsider those two verdicts and tell me what your true verdict is, based upon the law and the evidence. Are they guilty of murder or are they guilty of involuntary manslaughter? You should go back and deliberate some more."

After the jury had retired for further deliberations, counsel for Stocki stated that he had a question regarding whether a mistrial should be declared. The judge stated that he did not believe a mistrial would be appropriate. No other comments or objections were made by either defense counsel.

The jury subsequently returned its verdicts in open court for the

second time, finding the defendant and Stocki guilty of murder, aggravated battery, and battery, and not guilty of involuntary manslaughter. Judgment was entered on these verdicts.

Following a hearing in aggravation and mitigation, the defendant was sentenced to a 55-year term of imprisonment.

The defendant's first argument on appeal is that the trial judge erred by directing the jury to deliberate further when it returned verdicts of guilty of murder and guilty of involuntary manslaughter. He maintains that the judge should have vacated the murder conviction and entered judgment on the conviction of involuntary manslaughter on the ground that the guilty verdict of involuntary manslaughter amounted to an implied acquittal of the murder charge. Alternatively, he maintains, in effect, that a mistrial should have been declared because the guilty verdicts were inconsistent and demonstrated that the jury was confused.

In order to resolve these questions, we must first consider whether the guilty verdicts were inconsistent either legally or logically. Verdicts are legally inconsistent where they necessarily involve the conclusion that essential elements of the offenses were found both to exist and not to exist. Logical inconsistency is present where the verdicts demonstrate both acceptance and rejection of one party's theory of the case. *People v. Hoffer* (1984), 122 Ill. App. 3d 13, 460 N.E.2d 824; *People v. Murray* (1975), 34 Ill. App. 3d 521, 340 N.E.2d 186.

The defendant herein was charged with murder under section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par, 9—1(a)(2)). The jury was instructed in accordance with that provision that in order to find the defendant guilty of that offense, it had to find (1) that the defendant, or others for whose conduct he was legally responsible, performed the acts which caused Christo's death, and (2) that when the defendant did so, "he knew that his acts, or his acts in combination with the acts of others for whose conduct he [was] legally responsible, created a strong probability of death or great bodily harm" to Christo.

With respect to the offense of involuntary manslaughter, the jury was instructed that in order to convict, it must find (1) that the defendant, or others for whose conduct he was legally responsible, performed the acts which caused the death of Christo, and (2) that the defendant, or others for whose conduct he was legally responsible, "performed those acts recklessly," and (3) that those acts were likely to cause death or great bodily harm. The term "recklessly" was defined to the jury as follows:

"A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

The jury was also instructed that a person commits involuntary manslaughter when he "unintentionally" causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm. The defendant does not contend that the instructions set forth above do not adequately state the law.

■ In our judgment, guilty verdicts of both murder and involuntary manslaughter under these instructions are not legally inconsistent. No element of either offense was found both to exist and not to exist. The principal difference between the offenses is in the mental state. Murder, under section 9—1(a)(2), requires knowledge that one's acts create a strong probability of death or great bodily harm, whereas involuntary manslaughter requires only a conscious disregard of a substantial and unjustifiable risk that death will follow. These mental states, although different, are not mutually exclusive. In fact, a person who knows that his acts create a strong probability of death to another would necessarily, in performing those acts, be consciously disregarding a substantial and unjustifiable risk that death will follow. (See *People v. Hoffer* (1984), 122 Ill. App. 3d 13, 19, where this court concluded that "a finding of recklessness does not, in our opinion, necessarily negate a finding of knowledge ***." But see *People v. Milner* (1984), 123 Ill. App. 3d 656, 463 N.E.2d 148.) The defendant focuses on that portion of the instructions on involuntary manslaughter requiring the death to have been caused "unintentionally," and he maintains that the finding of that element was inconsistent with the finding of knowledge essential to the guilty verdict on the murder charge. The basic flow with the defendant's position is that it equates knowledge that one's acts create a strong probability of death with intent to cause death. In fact, the mental states are separate and distinct. Intent to cause death is one of the mental states required for murder under section 9—1(a)(1) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)). The lesser mental state of knowledge that one's acts create a strong probability of death is the mental state required under the provision at issue here, section 9—1(a)(2). Intent and knowledge are defined in article 4 of the Code as two separate mental states. Intent involves a "conscious objective or purpose," whereas knowledge connotes conscious awareness. (Ill. Rev. Stat. 1981, ch. 38, pars. 4—4 and 4—5.) A person who knows, *i.e.*, is consciously aware, that his acts

create a strong probability of death to another may not have such death as his conscious objective or purpose. (See Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 18 (Smith-Hurd 1979).) He may simply not care whether the victim lives or dies. Under these circumstances, the person would be guilty of murder although the death was caused "unintentionally." Accordingly, we find no legal inconsistency between the guilty verdicts of murder and involuntary manslaughter in this case. Compare *People v. Hoffer* (1984), 122 Ill. App. 3d 13, 23, where this court found an inconsistency between a finding that the death was caused "unintentionally" and a verdict of guilty of murder under section 9—1(a)(1).

■ Moreover, we do not perceive any logical inconsistency in the guilty verdicts under the circumstances of this case. The jury could have accepted the State's theory of the case, that the defendant participated in the beating of Christo, knowing that his acts created a strong probability of death and could have consistently found that the death was caused unintentionally, and that the defendant consciously disregarded a substantial and unjustifiable risk that death would follow. See *People v. Milner* (1984), 123 Ill. App. 3d 656, 668 (Heiple, J., concurring in part, dissenting in part).

■ Since there was no inconsistency, either legal or logical, in the verdicts of guilty of murder and involuntary manslaughter initially returned by the jury, it cannot be maintained that the jury was confused or "impliedly acquitted" the defendant of anything. Indeed, this court has held that even where there is a legal inconsistency between *guilty* verdicts, there is no implied acquittal. (*People v. Hoffer* (1984), 122 Ill. App. 3d 13, 19.) Accordingly, although it may have been error for the trial court to refuse to accept the verdicts, and to require the jury to deliberate further, the error was in favor of the defendant. The judge should have accepted the guilty verdicts and proceeded to sentence the defendant for murder pursuant to *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273. The defendant may not complain that the trial judge erroneously instructed the jury to change one of two valid guilty verdicts to not guilty.

■ The defendant also argues that when the judge directed the jury to redeliberate, he improperly told the jury to decide whether the defendants were guilty of murder or guilty of involuntary manslaughter, "with nothing being said about the rather basic alternative possibility" of a finding of not guilty on both charges. We note that defense counsel did not raise this objection to the judge's oral instruction to the jury either at the time it was made, or any time

prior to the jury's returning its verdicts for the second time. Had he done so, the trial judge could easily have cured the error, if there was any. Accordingly, this objection is waived. *People v. Palmer* (1982), 111 Ill. App. 3d 800, 444 N.E.2d 678.

The defendant also claims error in the introduction of his boots into evidence. The boots had been seized from his property box at the Du Page County jail pursuant to a search warrant, and subsequently type A blood was discovered on them. The warrant had been issued on the basis of an affidavit of Officer Derby which stated, among other things, that during his interview with the defendant at a jail in North Carolina about two weeks after the incident, the defendant told him that the boots he was then wearing were the same ones he had worn on the night in question. Prior to trial, the defendant moved to suppress the boots as evidence on the basis that he had never made such a statement, and that the portion of Derby's affidavit to the contrary was false. See *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674.

The trial court denied the defendant's motion without an evidentiary hearing on the ground that, because the boots were in the defendant's property box at the jail, no warrant was required to retrieve and examine them.

On appeal, the defendant contends that the trial court's decision that no warrant was required was incorrect. We disagree. In *United States v. Edwards* (1974), 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234, the defendant was arrested and charged with attempting to break into a post office. He was taken to the local jail and placed in a cell. Contemporaneously or shortly thereafter, investigation at the scene revealed that the attempted entry had been made through a wooden window which had been pried up with a pry bar, leaving paint chips on the window sill and screen. The next morning the defendant was given a change of clothes, and the clothing he had been wearing at the time of his arrest was examined and found to contain paint chips matching those on the window. The defendant sought to suppress his clothing on the basis that it was searched without a warrant. The trial court refused to suppress the clothes, and the United States Supreme Court agreed, concluding that no warrant was necessary. The court stated:

> "It must be remembered that on both May 31 and June 1 the police had lawful custody of Edwards and necessarily of the clothing he wore. When it became apparent that the articles of clothing were evidence of the crime for which Edwards was being held, the police were entitled to take, examine, and pre-

serve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered. [Citations.]" 415 U.S. 800, 806, 39 L. Ed. 2d 771, 777, 94 S. Ct. 1234, 1238.

In the instant case, the same considerations apply. The defendant does not dispute the lawfulness of the custody the police had of him or his clothing, and, therefore, when it became apparent that the boots were evidence, the police required no warrant to retrieve them and examine them for bloodstains.

The defendant seeks to distinguish *Edwards* by noting that in that case, when the clothes were seized, "the normal process incident to arrest and custody had not been completed," *i.e.*, Edwards' clothing had not already been taken and put in a property box. We find this distinction to be without legal significance. *Edwards* itself includes *dictum* to the effect that the result would have been the same if the clothing had been seized upon the defendant's arrival and held in the property room of the jail. (415 U.S. 800, 807, 39 L. Ed. 2d 771, 778, 94 S. Ct. 1234, 1239.) Other courts have approved of warrantless "second looks" at items placed in a prisoner's property box. See, *e.g.*, *People v. Richards* (1983), 94 Ill. 2d 92, 445 N.E.2d 319 (necklace removed from defendant's property envelope and shown to victim of burglary), and *State v. Gordon* (Mo. App. 1975), 527 S.W.2d 6 (defendant's pants removed from property room and tested for the presence of soil found at scene of homicide).

The defendant seeks to avoid the rule of *Edwards* by citing the later decision of *United States v. Chadwick* (1977), 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476, in which the United States Supreme Court held that police did require a warrant to search a locked footlocker lawfully seized from the defendants at the time of their arrest. *Chadwick*, however, is distinguishable because it involved a locked footlocker rather than the defendant's clothing. In fact, the court in *Chadwick* distinguished *Edwards* on that basis. (433 U.S. 1, 16 n.10, 53 L. Ed. 2d 538, 551 n.10, 97 S. Ct. 2476, 2486 n.10.) The defendant's contention that the police needed a search warrant to retrieve and examine his boots is not well taken.

The next contention by the defendant is that the evidence of his membership in the Hell's Henchmen motorcycle club denied him a fair trial. Prior to trial the defendant made a motion *in limine* to exclude evidence of his membership. The court denied the motion with respect to the observations of the occurrence witnesses concerning the wearing of "colors," but allowed it insofar as it applied to Hell's Henchmen paraphernalia seized from the defendant's residence. We

find no error in this ruling.

Evidence of gang affiliation is admissible if relevant to the issues in the case. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658, and *People v. Miller* (1981), 101 Ill. App. 3d 1029, 428 N.E.2d 1038.) In the instant case, there was evidence that Christo was beaten in retaliation for calling the Hell's Henchmen "Henchkids." Accordingly, the defendant's membership in that organization was relevant on the question of his accountability for the acts of others, and of his motive. *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.

The defendant objects particularly to questions the State asked police officers about a tattoo the defendant had, presumably related to the Hell's Henchmen motorcycle club. When the questions were asked, defense counsel promptly objected, the court sustained the objection, and the jury was never informed of the nature of the tattoo. We have carefully reviewed the record in this case and do not find that the references to Hell's Henchmen unfairly prejudiced the defendant.

■ The next contention raised by the defendant concerns the testimony of Judie Welch about the tests she performed on the blood found on the defendant's boots. As noted above, Welch testified that the blood found on the defendant's boots was type A, and that both Christo and the defendant, along with 40% of the Caucasian population, had that blood type. Stocki's blood was type O. The defendant maintains that this testimony should have been stricken because it had very limited probative value in that the blood could have come from 40% of the Caucasian population, and because the manner in which Welch gave that testimony was confusing. No authority is cited in support of these contentions. In *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 321 N.E.2d 398, blood type evidence of the nature involved herein was held to be relevant and admissible notwithstanding its limited probative value. (See also *People v. Bush* (1981), 103 Ill. App. 3d 5, 430 N.E.2d 514.) Furthermore, we do not believe that the manner in which Welch gave this testimony was confusing. She testified on cross-examination as follows:

"Q. And you said that the blood that you found there [on the defendant's boots] was consistent or would be consistent with both blood from George Christo and from Michael Deacon; is that correct?

A. That's correct.

Q. It would also be consistent with 40 out of every 100 Caucasians in the United States.

A. That's correct."

Welch's testimony was clear, straightforward, and easily understood.

The defendant also maintains that Welch should not have been allowed during her testimony to show the jury a plate of the type she customarily used in the laboratory to determine the PGM type of blood. The document was not tendered in discovery, and the defendant objected on that basis. In response to this objection the State indicated that it was not attempting to prove the accuracy of the test results shown on that particular plate, but wanted to show the plate to the jury to help Welch explain the process of PGM testing. The court admonished the jury as to the limited purpose of the evidence, and the defendant made no further objection, nor did he seek a short continuance to investigate the item further. Under these circumstances, the issue has been waived. *People v. Dahl* (1982), 110 Ill. App. 3d 295, 442 N.E.2d 321.

■ Finally, with respect to the evidence of blood type, the defendant maintains that his conviction should be reversed because the prosecutor, during closing argument, twice misstated the evidence when she told the jury that the blood found on the defendant's boots was consistent with that of Christo, but inconsistent with that of both Stocki and the defendant. On each occasion defense counsel objected, and the judge informed the jury that statements by the attorneys were not evidence, and that the jurors should use their own memories as to what the evidence was. It has been held that such an admonishment is adequate, at least where the defendant, as in the instant case, does not seek a more specific ruling. (*People v. Mack* (1984), 105 Ill. 2d 103.) The erroneous argument of the prosecutor did not, therefore, give rise to reversible error.

■ The defendant's next argument is that Officer Derby was improperly allowed to testify about that portion of the defendant's statement to him to the effect that the defendant had taken speed on the night of the occurrence. The defendant characterizes this testimony as improper evidence of a separate crime. (See generally *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.) At the time this evidence was introduced, however, the defendant made no objection. Accordingly, this issue has been waived. (*People v. Sebag* (1982), 110 Ill. App. 3d 821, 824, 443 N.E.2d 25.) The defendant seeks to avoid this result by citing *People v. Oden* (1960), 20 Ill. 2d 470, 170 N.E.2d 582, a case in which our supreme court relaxed the waiver rule and reversed the defendants' murder convictions and death sentences because their statements to police, admitted into evidence without objection, referred to other crimes. *Oden*, however, is readily distinguishable from

the instant case. In *Oden* the other crimes were similar to the one for which the defendants were on trial. They were charged with a murder committed during the course of an armed robbery. The post-arrest statements of the defendants referred to other robberies and "stick-ups." Generally, the more similar other crimes are to the offense for which the defendant is being tried, the greater is the danger of prejudice. (*Cf. People v. Ellison* (1984), 123 Ill. App. 3d 615, 631, 463 N.E.2d 175.) In the instant case, the other offense, possession of a controlled substance, was not at all like the offense for which the defendant was on trial, murder. Moreover, in *Oden* the prosecutor argued to the jury that one of the defendants had thrown his opportunities away on a career of crime. The defendant can point to no similar comment in the instant case. Finally, in *Oden* it was maintained that the failure to object was the result of incompetence of counsel, and no such claim is made in the instant case. We do not believe that *Oden* supports relaxation of the waiver rule in the instant case.

The defendant's next argument concerns the exclusion from evidence of certain photographs taken of the crime scene at night and tendered by the defense, and the admission on the State's behalf of other photographs of the area taken during the daytime. The fatal beating of Christo occurred about 1:30 a.m. on June 12, 1982. At trial, the defense tendered two photographs of the crime scene which had been taken at night. These pictures each showed an individual standing near the tavern, but because of the darkness of the photographs, neither his facial characteristics nor the type of clothing he was wearing could be observed. The photographs were tendered by the defense in order to impeach Chernetzki's account of what she observed on the night in question.

The defense attempted to lay a foundation for these photographs on cross-examination of Chernetzki. When she was asked whether the first of the two photographs she was shown portrayed the scene as it appeared on the night in question, she replied that she could not say for sure. Chernetzki testified that the second photograph appeared to be darker than the scene appeared that night.

The defense then called the photographer who took the pictures. He testified that he took them in November of 1982 around 1 a.m., but he was not asked whether they accurately depicted the scene as he observed it at that time.

In order for a photograph to be admissible in evidence, it must be identified by a witness as a portrayal of certain relevant facts, and be verified by such witness on personal knowledge as a correct representation of such facts. (*People v. Donaldson* (1962), 24 Ill. 2d 315, 181

N.E.2d 131.) Here, the photographs were offered to show the lighting conditions at the scene of the offense, yet no witness verified that they accurately showed such conditions. Accordingly, they were properly excluded from evidence. See *People v. Williams* (1979), 71 Ill. App. 3d 547, 390 N.E.2d 32.

Furthermore, we find no error in the admission on the State's behalf of photographs of the area taken during the daytime. These pictures were not introduced to show the lighting conditions on the night of the offense, and so there was no danger that they would confuse the jury in that respect. See *Warner v. City of Chicago* (1978), 72 Ill. 2d 100, 378 N.E.2d 502.

■■■ The defendant's final contention with respect to his conviction of murder is that the cumulative effect of all the errors deprived him of a fair trial. In this regard he refers to the assignments of error discussed above, and to seven additional claims of error. Of the seven additional claims, only two are supported by authorities and argument, and they will be considered below. The remaining five are presented without citation of any authority, and with an argument which is little more than a bare assertion of the issue sought to be raised. We will not consider points raised in that fashion. *People v. Ortiz* (1980), 91 Ill. App. 3d 466, 414 N.E.2d 1072.

■■■ The first of the two additional claims of error which have been supported with authorities and argument is that the court erred in refusing to disclose to the defense prior to trial a file kept by the Illinois Department of Law Enforcement (IDLE) on the defendant and other members of the Hell's Henchmen motorcycle club, as well as a document entitled Criminal Intelligence Bulletin No. 15, which mentioned Christo's friends and close associates. This issue has been waived for purposes of appeal. The trial court reviewed these materials *in camera* prior to denying the request for disclosure. When the request was denied, the State moved that the documents be returned to the IDLE. That motion was granted without an objection by the defense to the effect that they should be made a part of the record. The defendant has not sought to supplement the record on appeal with the relevant materials. Under these circumstances, the issue cannot be addressed. *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334.

The second additional claim of error supported with an appropriate discussion is that the trial court erred when it allowed Chernetzki to testify, on direct examination by the prosecutor, not only to the fact of her prior convictions for delivery of a controlled substance and cannabis which the defendant accepts as admissible, but also to the

fact that she pleaded guilty and was sentenced to a 2½-year term of probation which she successfully completed. No objection to the latter testimony was presented when it was elicited, and the question of its propriety is, therefore, waived. *People v. Sebag* (1982), 110 Ill. App. 3d 821, 443 N.E.2d 25.

We have carefully considered all of the assignments of error addressed above and do not believe that individually or collectively they call into question the fairness of the defendant's trial.

The final argument raised by the defendant concerns his 55-year sentence of imprisonment. That sentence was for an extended term under section 5—8—2(a)(1) of the Unified Code of Corrections. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)(1).) The extended term was imposed on the basis of the trial court's finding that the defendant's offense was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(2).

The defendant contends that that finding was erroneous, and that, in light of all of the attendant circumstances, the sentence was excessive.

The evidence at trial showed that the defendant came upon the scene after Christo had already been severely beaten. In fact, according to Chernetzki, Christo was no longer even trying to protect himself. It is difficult to conceive of a more brutal and heinous act, more indicative of wanton cruelty, than to approach such a person, rendered helpless by a previous beating, and to stomp upon his head while wearing motorcycle boots. It is appropriate to consider in this regard also that the motivation for the defendant's conduct was that he had been informed that the man lying on the ground had referred to the members of the defendant's club as "Henchkids" rather than "Henchmen." We find no error in the trial court's finding that extended-term sentencing was appropriate in this case. See *People v. Nester* (1984), 123 Ill. App. 3d 501, 462 N.E.2d 1011 (finding of exceptionally brutal or heinous behavior indicative of wanton cruelty upheld in case of cold-blooded attack upon a person already beaten in a fight).

Furthermore, we find no error in the specific sentence selected within the extended-term range of penalties. The trial court is, of course, normally the proper forum in which a suitable sentence is to be determined, and its decision should not be reversed in the absence of an abuse of discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) We have carefully considered all the evidence in aggravation and mitigation, including the defendant's previous convic-

tions of forgery, aggravated assault, leaving the scene of an accident, and other misdemeanor and traffic offenses, and we conclude that the 55-year sentence of imprisonment was not an abuse of discretion. Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

REINHARD and HOPF, JJ., concur.