THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARLTON HORNE, Defendant-Appellant.

First District (2nd Division)   No. 83—1182

■

Opinion filed December 28, 1984.

James J. Doherty, Public Defender, of Chicago (Alison J. Norwood and Robert P. Isaacson, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Cuomo, and Joan M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

After a jury found defendant guilty of two counts each of rape, attempted murder, aggravated battery, armed violence, and home invasion, and one count of armed robbery, the circuit court sentenced him to an aggregate term of imprisonment of 120 years. On appeal, defendant raises as issues whether: (1) he was denied a fair trial by certain alleged instances of prosecutorial misconduct; (2) his extended term sentence for attempted murder was improper; (3) he was erroneously sentenced for both armed violence and attempted murder; and (4) his sentences were improperly augmented by application of both extended term and consecutive sentencing provisions.

At trial, J.T. testified that after she left work at 8 p.m. on May 10, 1982, she went to the home of her friend, M.S., who was babysitting J.T.'s five-year-old daughter. While she was there, defendant stopped by and conversed with M.S. in the kitchen while J.T. watched television in the living room. M.S. and defendant came into the living room, where they all watched television; defendant then left. J.T. lay down on the living room floor, fully dressed, and fell asleep. The next thing she recalled was waking up in the burn unit of Cook County Hospital, where she remained for two months, after which she spent five months at Oak Forest Hospital. She suffered a head injury, her legs were burned, and all her toes were burned off. She did not see who had hit her on the head.

M.S. testified that on May 10, 1982, she lived in an apartment with her two-year-old son and eight-year-old daughter. Sometime after 8 p.m. on that date, her friend J.T. arrived. J.T. said she was tired and asked to spend the night there. The children were put to bed in the rear bedroom. There was a knock at the kitchen door and defendant, known to M.S. as "Squirrel," asked to come in for a glass of water. She opened the door and the burglar gates and admitted him. They conversed briefly and then entered the living room and watched television for a "pretty good little while." She asked him to leave, escorted him to the door, and locked it behind him. After accidentally dropping her cigarettes into the toilet, she went across the street to a 24-hour store. Returning home, she took out her keys to unlock her front door. She heard a "commotion," turned around, and was struck under her right eye. She struggled with her assailant. They fell against her door and into her apartment. In the kitchen, she recognized her attacker to be defendant. He picked up a hammer, chased her into the living room, and hit her on top of the head, causing her to fall. He dazed her with a blow behind her right ear. Defendant

went to J.T., who was still asleep on the floor, grabbed her by her hair, and "he hit her and he hit her and he hit her" with the hammer. He released her head, which dropped to the floor. Every time she moved or moaned, he hit her again. He finally stopped. He vomited beside J.T. He went into the kitchen, where drawers were heard opening and closing. Defendant returned to the living room, and went through J.T.'s pockets, removing her money, bracelet, and earrings. He found two children's coin banks and shook the money from them. He ransacked the hall closet.

Defendant returned and pulled off J.T.'s pants. He removed his own shorts and inserted his penis inside her, saying, "[a]ct like you like it, bitch, act like you like it." Defendant then took off M.S.'s pants and cut the bottom of her leotard with a knife. Removing a sanitary napkin, he inserted his penis into her vagina. M.S. "just laid there because I was scared." She blinked her eyes, unable to keep them closed. He told her: "Bitch, I will spare your life if you open your eyes." She opened her eyes and asked him why he was doing this. Defendant got up, picked up a cement bank and hit her head twice with it, then broke the bank over J.T.'s head. He had intercourse with J.T. again. He went to the washroom and returned, wiping himself with a towel. He put his shorts back on. He then ransacked the apartment.

From the closet, defendant took a maroon bag containing a zoom lens, tape recorder, CB radio, and TV equalizer. He looked through J.T.'s purse and said, "I'm gone fix it so won't nobody look at y'all again." He wrapped J.T. in a comforter and threw a blanket over M.S. She smelled lighter fluid and could hear matches being struck. She smelled something burning. Defendant left the room, returned, and hit the front of her neck with a pop bottle. He then wiped off door knobs and the "places that he had touched" with a towel. He covered her up again. She could hear the striking of matches, and felt the cover begin to burn. She felt the heat on her feet and legs. After she heard the kitchen door close, she pulled off the cover, crawled to J.T. and pulled the comforter from her. The room was filled with smoke. She put out the flames with water, then called the police and fire departments. She told the arriving police what happened and identified and described her attacker. She described the items that might have been taken from her apartment by defendant. She was taken to Loretto Hospital, remaining there three to four weeks. Her hands were burned, her thumb was "separated from" her hand, and her arms, legs and face were bruised.

The Chicago police officer who arrived at M.S.'s apartment at

about 3 a.m. on May 11, 1982, testified that M.S., who was covered with blood, said she had been raped. The apartment "looked like a cyclone" had hit it and was covered with a layer of smoke. J.T. was lying on the floor. M.S. said that "Squirrel" had attacked them, describing his clothing to the officer. Defendant was arrested at his home shortly thereafter. Another police officer testified that he found a maroon bag containing a cassette player and a CB radio in the garbage dumpster behind defendant's apartment building.

A Chicago police microanalyst tested blood samples, vaginal smears, and various items recovered by evidence technicians. Blood from the carpet was found to be type AMN, the same as J.T.'s. The broken cement bank was found to have blood of type A, as well as human hair similar to J.T.'s. Defendant's fingernail clippings contained blood, but in an insufficient amount to be typed. Defendant's socks were negative for blood, but human blood, not typed, was discovered on his shoes and shirt. Vaginal smears from both victims tested negative for the presence of spermatozoa.

A physician examined M.S. in the hospital on the morning of May 11, 1982. He observed a hematoma under her right eye, multiple cuts on her head that had been sutured, and an open laceration on her right thumb. The injuries to her head and neck were consistent with hammer blows. A specialist in burn surgery examined J.T. on May 11, 1982, and found 20% of her body, mainly from her knees down, covered with second and third degree burns. She was unconscious and on a respirator. X rays revealed skull fractures on either side of her head, requiring immediate surgery. A microsurgeon performed a bilateral craniotomy later that day. The burn surgeon subsequently operated on J.T. five times and amputated all her toes because they had become gangrenous.

Defendant testified on his own behalf. A month before the subject incident, he went to M.S.'s apartment. He then accompanied her to the intersection of Madison and Austin, where they were picked up by a van containing three men, one of whom, named Snake, was known to defendant, as they had been fellow inmates during defendant's previous incarceration. The others were introduced to him as Robert and Mike Spencer. The van pulled into an alley, and M.S. gave the bag she had been carrying to Robert. After some "reefer" was rolled up, Robert gave money to M.S. in exchange for the bag. The van returned M.S. and defendant to Madison and Austin, and they walked back to M.S.'s apartment. M.S. gave him three bags of marijuana and $10 when they returned. Sometime between 1 and 2 a.m. on May 11, 1982, defendant heard a knock at his door. The person identified him-

self as Snake and told him M.S. was "in some trouble" and needed his help. He dressed and went in the van with Snake and Mike to M.S.'s apartment. He was pushed inside the apartment and led into the living room. A light was turned on and he saw M.S. and J.T. on the floor "all bloody and everything." He got sick. He was asked for money and marijuana and patted down. He put M.S.'s bloody face on his lap, and she asked him to see if her children were all right. He was escorted to the bedroom, where he found the children safe. He related this to M.S. He asked her where the marijuana was so that they would leave, but she told him she had no more. Snake then walked up to him with a maroon bag and told him to get up, which he did. Snake then "slung the bag" at him, hitting his chest with it. He was told to take the bag, which he did. He was driven home and warned to remain quiet. Police arrived shortly thereafter and arrested him. On cross-examination, he testified that Mike threw the bag at him. The defense rested.

After defendant was found guilty as outlined above, and after the court denied defendant's motion for a new trial, a sentencing hearing was conducted. A Chicago police officer testified that on November 15, 1979, he arrested defendant, who was holding a bloody straight razor. He was then taken to a hospital, where a woman identified him as the assailant who robbed her and inflicted two deep slash wounds to her throat. The State filed certified copies of the following convictions: burglary, 1974, sentenced to three years' probation; unlawful use of weapons, 1976, sentenced to one year's imprisonment; three counts of theft, 1979, two years' imprisonment; and aggravated battery, 1980, five years' imprisonment.

In imposing sentence, the circuit court noted that it considered the offenses against each of the victims separately, as defendant's actions indicate that his intent as to each was different. Accordingly, the order of sentence is divided into two parts, one reflecting defendant's offenses against M.S. and the other those against J.T.; the court ordered that the sentences with respect to each victim be served consecutively. As to the counts involving J.T., defendant was sentenced to concurrent terms of 45 years for attempted murder, 10 years for rape, and 10 years for armed violence; as to those counts involving M.S., he received consecutive terms of 45 years for attempted murder and 30 years for rape, and concurrent terms of 20 years for home invasion, and 10 years for armed violence. The sentences aggregated 45 years for offenses involving J.T. and 75 years for those involving M.S., with a total aggregate sentence of 120 years. This appeal followed.

I

Defendant contends that he was denied a fair trial by virtue of certain prejudicial remarks made by the prosecution during its rebuttal closing argument. Defendant points to the prosecutor's statements that defense counsel "literally attacked" M.S. on the witness stand, and that counsel's cross-examination effectively put her on trial. Further, defendant argues that the prosecutor interchanged the identities of defendant and his counsel by referring to counsel's "testimony."

██ ██ Generally, intimations that defense counsel has used trickery or misrepresentation to free his client are improper. (*People v. Emerson* (1983), 97 Ill. 2d 487, 497, 455 N.E.2d 41; *People v. Starks* (1983), 116 Ill. App. 3d 384, 394, 451 N.E.2d 1298), as such comments tend to arouse the antagonism of the jury and try the lawyers rather than the issue of guilt (*People v. Ray* (1984), 126 Ill. App. 3d 656, 660, 467 N.E.2d. 1078; *People v. Suggs* (1977), 50 Ill. App. 3d 778, 783, 365 N.E.2d 1118). Here the subject remarks did not suggest any prevarication or use of "trickery" on the part of defense counsel, but were permissible comments on trial tactics employed on defendant's behalf. (See *People v. Thomas* (1983), 116 Ill. App. 3d 216, 222, 452 N.E.2d 77; *People v. Johnson* (1979), 73 Ill. App. 3d 431, 434-35, 392 N.E.2d 587.) Furthermore, the comment regarding defense counsel's "testimony" was neither objected to at trial nor specified in defendant's post-trial motion; defendant thus waived his objection to any alleged error in this regard, which also does not constitute plain error. *People v. Jackson* (1981), 84 Ill. 2d 350, 358-60, 418 N.E.2d 739; *People v. Turk* (1981), 101 Ill. App. 3d 522, 530, 428 N.E.2d 510.

Defendant also claims to have been prejudiced by the prosecutor's comment that "[y]ou [the jury] stand between Carlton Horne and the streets, where he can reek [*sic*] more havoc on today's society." Such comments, however, dwelling on the results of crime and urging a fearless administration of the law, are not improper. *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 721, 431 N.E.2d 1154; *People v. Johnson* (1979), 73 Ill. App. 3d 431, 435-36; *People v. Ivery* (1979), 72 Ill. App. 3d 158, 161, 390 N.E.2d 608.

██ Defendant lastly urges that the cumulative impact of the foregoing remarks requires reversal. Generally, a prosecutor has wide latitude in his closing argument, and improper remarks will not merit reversal unless they substantially prejudice defendant (*People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200; *People v. Pittman* (1982), 93 Ill. 2d 169, 176, 442 N.E.2d 836), with consideration given to the content of the language used, its relationship to the evidence, and its effect on defendant's right to a fair and impartial trial (*People v. Ray*

(1984), 126 Ill. App. 3d 656, 663; *People v. Brown* (1983), 113 Ill. App. 3d 625, 630-31, 447 N.E.2d 1011). In view of the overwhelming evidence of defendant's guilt, it is doubtful that the cumulative effect of the remarks complained of, even if prejudicial, would have materially affected the jury's verdict.

## II

■ Defendant next maintains that the circuit court erred by imposing an extended term sentence for attempted murder, while failing to find that his conviction for home invasion was also accompanied by behavior permitting imposition of an extended term. Here, defendant's convictions with respect to M.S. included ones for attempted murder and home invasion. The circuit court specifically found that the attempted murder by burning was "exceptionally brutal and indicative of wanton cruelty, almost heinous behavior beyond belief." Accordingly, the court's entry of an extended term of 45 years on this conviction was proper. (See Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2).) The court, however, did not find that the home invasion count, premised on the same acts as the subject attempted murder count, was accompanied by similar behavior permitting the imposing of an extended sentence.

Defendant contends that the home invasion conviction is the "more serious" offense; therefore, the court's action here allegedly contravened section 5—8—2(a) of the Unified Code of Corrections (Code). (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a).) We disagree. The cases relied upon by defendant are inapposite, as in both *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, and *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804, imposition of extended terms for less serious offenses was deemed improper where the subject felonies were of different classes. Here, by contrast, home invasion and attempted murder are both Class X felonies and, accordingly, are of equal seriousness. Ill. Rev. Stat. 1983, ch. 38, pars. 8—4(c)(1) and 12—11(b).

Defendant nevertheless insists that home invasion is here the more serious offense because the home invasion count required proof of all elements required for the attempted murder count, in addition to other elements. We disagree. Defendant's home invasion conviction required proof that he "intentionally injured" his victim; his attempted murder conviction, on the other hand, necessitated proof of a specific intent, vastly different from that required for home invasion. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a).) As a result, it was possible here that defendant could have been found guilty of home inva-

sion without also being found guilty of attempted murder. The circuit court did not err by imposing the extended term only on the attempted murder conviction.

## III

■ Defendant urges that he should not have been sentenced for both armed violence and attempted murder, as both offenses were based on the same physical acts. In *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, the supreme court considered the issue of multiple convictions premised on a single physical act and held that a defendant is prejudiced only when he "is convicted of more than one offense, some of which are, by definition, lesser included offenses." Armed violence requires proof of an underlying felony. (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2.) Thus, multiple convictions for armed violence and its underlying felony, which, by definition, is an included offense, cannot stand where the same physical act is the basis for both charges. *People v. Donaldson* (1982), 91 Ill. 2d 164, 170, 435 N.E.2d 477.

In determining whether a defendant's conduct constituted a single act or multiple acts, courts have considered: (1) the existence of an intervening act or event; (2) the time interval between successive parts of defendant's conduct; (3) the identity of the victim; (4) the similarity of the acts performed; and (5) whether the conduct occurred at the same location. (*People v. Baity* (1984), 125 Ill. App. 3d 50, 52-53, 465 N.E.2d 622.) In light of these factors, the court here correctly found that defendant's conduct consisted of a number of separate acts. Those of his actions which support the attempted murder charge—striking the victims with a hammer and a coin bank, and setting them on fire—although part of a continuous course of conduct, were separated by various intervening acts, occurred over a considerable period of time, were inflicted on different victims in different parts of the apartment, and were dissimilar acts.

Defendant, however, argues that, because the indictments resulting in his convictions for attempted murder and armed violence were all based on the same acts, the sentence for armed violence was improper. Prosecutorial intent, as reflected in the language of the indictment, is another factor to be considered in determining whether defendant's conduct constituted a single act or several separate acts. (*People v. Baity* (1984), 125 Ill. App. 3d 50, 54; *People v. Davis* (1981), 100 Ill. App. 3d 268, 271, 426 N.E.2d 1047.) By citing the same acts in all the relevant indictments, the State evidenced an in-

tention to treat defendant's conduct as a single act. Nevertheless, in view of the strength of the other factors cited above, the circuit court did not err by sentencing defendant for both attempted murder and armed violence.

IV

■ Defendant lastly maintains that the circuit court improperly augmented his sentences for a series of "closely related and almost simultaneously committed acts" by applying both extended term and consecutive sentencing provisions. Section 5—8—4(b) of the Code provides that a sentencing court "shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(b); see *People v. Pittman* (1982), 93 Ill. 2d 169, 178, 442 N.E.2d 836.) A finding consistent with this provision was expressly made here by the circuit court. We therefore find no error in this regard.

The cases relied upon by defendant to urge that the sentences here were inherently unfair are distinguishable, in view of defendant's prior history of violent criminality and the brutal and violent circumstances of the instant offenses. (*Cf. People v. Gray* (1984), 121 Ill. App. 3d 867, 460 N.E.2d 354; *People v. Griffin* (1982), 113 Ill. App. 3d 184, 446 N.E.2d 1175; *People v. Pace* (1975), 34 Ill. App. 3d 440, 339 N.E.2d 785; *People v. Zadel* (1979), 69 Ill. App. 3d 681, 387 N.E.2d 1092.) *People v. DeSimone* (1982), 108 Ill. App. 3d 1015, 439 N.E.2d 1311, cited by the State, is considerably more apposite to the instant situation. There, the court's requirement that defendant serve consecutively two 60-year sentences for attempted murder and armed robbery was upheld, as defendant had a prior murder conviction on his record. Here, similarly, defendant's criminal history, as well as the nature and circumstances of the present offenses, support the court's conclusion that consecutive sentencing "is not only justified, but is necessary to protect the public."

The instant sentences also do not contravene section 5—8—4(a) of the Code, which provides, in relevant part (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(a)):

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which

defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively."

The court specifically found that defendant's original criminal objective was rape, but that, "some considerable time later," it changed to attempted murder. The evidence, reflecting defendant's various actions on the night in question, supports the court's conclusions in this regard. Moreover, even if defendant's criminal objective is viewed as unchanging throughout the incident, consecutive sentencing was proper in that he was convicted of a Class X felony and inflicted severe bodily injury upon his victims. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(a); *People v. DeSimone* (1982), 108 Ill. App. 3d 1015, 1023.

As there is no indication that the circuit court abused its discretion in applying the consecutive sentencing provisions of the Code, we find no basis for altering these sentences. See *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.