THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN W. LILLY, Defendant-Appellant.

Fifth District   No. 5—84—0490

Opinion filed December 20, 1985.

Harvey C. Welch, of Urbana, for appellant.

John R. Clemons, State's Attorney, of Murphysboro (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, and Joseph H. Ciaccio, Sr., of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant, John W. Lilly, was charged with the murder of Edward Fletcher, Jr. Following a jury trial in the circuit court of Jackson County, he was found guilty and sentenced to 40 years' incarceration.

The pertinent facts adduced at trial are as follows:

Carolyn Fletcher, a/k/a Carolyn Patterson, testified that on Sunday, October 30, 1983, she arrived on "the Levee" (a tavern and nightclub area in northeast Carbondale) at approximately 9 p.m. for an evening out. She was accompanied by three other women, Nora Lee Farr Colbert, Brenda Moore, and Beverly Moore.

As Mrs. Fletcher was walking toward the business establishment, she passed by John W. Lilly, who was walking in the opposite direction. Mrs. Fletcher had gone to high school with Lilly. She stated that Lilly was dressed in dark clothing and had a "wolfman's" mask sitting atop his head.

Mrs. Fletcher then encountered her husband, Edward Fletcher, Jr., and her boyfriend, Paul Barr, arguing with each other near the Cadillac Lounge. She then left the area of the "Levee" for a short time and returned. Upon her return, she took a position across the street from where Edward Fletcher and Barr were arguing. At approximately 9:24 p.m., Mrs. Fletcher observed a masked man come out of an alley near where her husband and Barr were arguing, walk up to her husband, and shoot him in the head. She then saw the masked man going back down the alley, running from the "Levee" district. Mrs. Fletcher immediately went into Fat's Lounge, located near where she was standing, and reported the shooting to the Carbondale police department. At that time, she also identified John Lilly as the shooter.

Officer John B. Sytsma testified that he was dispatched to the location of Carter's Aluminum & Recycling Center at 9:24 p.m. on October 30, 1983. He identified the victim as Edward Fletcher. After talking with witnesses, he radioed two other units, informing them he had a suspect's name, John Lilly. He examined the scene and found

nothing that could be construed as a weapon on or near Mr. Fletcher. He also did not observe anyone dressed in halloween-type costumes.

Jeff Moore testified that on October 30, 1983, between 9 p.m. and 9:30 p.m., he was in the 200 block of North Washington in Carbondale. He stated that he saw Edward Fletcher and Paul Barr arguing that evening. He said that he was standing about 100 yards from Mr. Fletcher on the same side of the street at the time Mr. Fletcher was shot. He stated that a person dressed as a werewolf shot Mr. Fletcher. He stated that the person who shot Mr. Fletcher had a full head mask over his head, but he could not remember the clothing worn by the assailant. He further stated that the person who shot Mr. Fletcher ran down the alley on the south side of Carter's building. The witness then denied talking to Officer John Sytsma on the evening in question, and over the defendant's objection the prosecutor was allowed to impeach the witness and question him as if under cross-examination pursuant to Supreme Court Rule 238 (87 Ill. 2d R. 238). Moore denied seeing John Lilly on the square in the 200 block of North Washington on October 30 but later admitted to telling a black police officer immediately after the incident on the night in question that John Lilly was the man who shot Eddie Fletcher. He also stated that he did not want to testify in this particular case.

Edward Mims testified that he was in the 200 block of North Washington on the night of Sunday, October 30, 1983. He admitted seeing and hearing Barr and Fletcher arguing and stated that he was standing next to them while they were arguing. He testified that he saw Fletcher get shot and stated that a man in a wolf mask shot Fletcher with a silver, small-caliber handgun. Mr. Mims then denied telling the police who the man was in the wolfman mask. The prosecutor again invoked Supreme Court Rule 238 (87 Ill. 2d R. 238), which was allowed over the defendant's objection, and Mims admitted talking to Sergeant Don Strom of the Carbondale police department after the incident. Mims stated that Strom had asked him, given the way the assailant walked and talked, whether he seemed like John Lilly. Mims replied affirmatively.

Cynthia Ware also testified. She stated she had been talking to Mr. Fletcher for almost an hour when somebody in a mask shot Mr. Fletcher in the head. She stated that the assailant had on a blue pair of pants, a jacket coat, and a half-mask (a mask that did not cover the back of the killer's head.) She also mentioned that Mr. Fletcher was shot by a silver gun.

Paul Barr admitted having an argument with Fletcher on October 30, 1983, but denied knowing who shot Fletcher or what the person

was wearing. He stated that he did not see Fletcher get shot, but heard the shot, froze, turned around, and saw Fletcher lying on the ground. He further stated that he saw a knife in Fletcher's hand and that Jeff Moore took it from Fletcher. He stated that the defendant was a friend and that he had known him for a couple of years. The prosecutor then cross-examined Mr. Barr pursuant to Supreme Court Rule 238 (87 Ill. 2d R. 238). The prosecutor questioned Barr about an interview he had with the police on October 31, 1983. At that time, he was asked if he took anything out of the pockets or the hands of Edward Fletcher on the night in question, and he replied, "No." He admitted that on October 20, 1983, he took a trip to Tuscola with John Lilly and Michael Braun. Unknown to him at the time, Braun was an undercover agent with the State of Illinois. They met a woman at the truck stop and proceeded back to Carbondale. He denied that on the return trip defendant pulled out a .32-caliber silver revolver and showed it to him, explaining that he had received it from Rose Johnson, the woman at the Dixie Truck Stop. He stated "the only thing we had was drugs." He admitted having a conversation with Braun on November 1, 1983, at approximately 11:45 a.m., at his residence. However, he denied telling Agent Braun that he and defendant had decided the previous Sunday, October 30, to locate Edward Fletcher on the square and that Lilly would dress in a halloween costume and kill Fletcher. Barr stated that all he and Braun discussed were drug transactions. He also denied telling Braun that he assisted Lilly and threw the gun in the lake. Mr. Barr was further impeached by a conviction in Jackson County circuit court in 1982. for theft and two counts of battery and a conviction in the United States District for the Southern District of Illinois on counts of an indictment for knowingly conspiring and agreeing with others to distribute cocaine.

Ora Lilly, defendant's grandmother, Carol Lilly, defendant's aunt, and Wilbert Lilly, defendant's first cousin, all testified that they were present at Ora Lilly's residence on October 30, 1983, and saw John Lilly. Carol Lilly stated that John Lilly arrived at the residence on at least two occasions, one prior to the beginning of the program "Motown 25," which began at 8 p.m., and second time around 9 p.m. She stated the first time he was playing with the children and the second time he played with the children and asked her mother for a ride home. She didn't remember whether or not John Lilly had a mask but recalled that the children had masks and were playing with masks. She admitted making a statement to the Carbondale police on October 31 and admitted, after reading her statement, that defendant had on October 30, 1983, a full mask that had dark hair on it which could

perhaps pass for a person's real hair. She stated that the mask looked like a wolf.

Ora Lilly stated that she saw her grandson, the defendant, at about 6 p.m. on October 30, 1983, when he came by the house. She did not know how long he stayed and saw him again around 9 p.m., when he came to the house. She recalled, after reading her statement given to Carbondale police on October 31, that Lilly had a pullover-type mask, which she described as a Frankenstein or werewolf.

Wilbert Lilly testified that he saw his cousin at his grandmother's house at approximately 8:45. He was not sure whether or not John Lilly had a mask with him. He also had made a statement to the Carbondale police on October 31 and indicated John Lilly had a mask and that it was a werewolf mask.

Don Strom, a police officer for the city of Carbondale, stated that on October 30, 1983, at about 9:30, he was advised by their radio dispatcher of a shooting in the 200 block of North Washington. He and Officer Deborah Smith got into the squad car and drove to the apartment complex where Lilly was living. He left Officer Smith there for surveillance purposes and proceeded to the site of the shooting. There he talked with Officer Sytsma and later with Edward Mims. He was then advised by radio that Officer Smith had observed some vehicles entering the apartment complex. He requested assistance and was then advised by Officer Smith that defendant's car was leaving the complex. The automobile was stopped, and John Lilly was ordered out of the car, placed in custody and advised of his rights.

John Kluge, a detective with the Carbondale police department, testified that he and Detective Brandon interviewed Lilly after he was arrested. Defendant denied being downtown the evening of October 30.

K. Gary Otey conducted a gunshot residue test on the hands of Lilly on October 30, 1983. Various officers testified as to the chain of custody of the gunshot residue kit.

Donald Havekost, a special agent with the Federal Bureau of Investigation, then testified. He stated that he had received the gunshot residue kit from the Carbondale police department. He stated that the samples taken from the back of the defendant's right hand and the back of defendant's left hand had amounts of both antimony and beryllium, which in his opinion are consistent with the amounts he would expect to find on the hands of a person who had recently discharged a firearm or otherwise been close to a firearm when it discharged.

Michael Braun testified. He stated he was a special agent with the Illinois Department of Law Enforcement, Division of Criminal Investi-

gation. He stated that he met Mr. Barr while working on an undercover investigation in Carbondale and also stated that he knows John Lilly. He stated that neither individual knew he was a law enforcement agent. He testified that he met Paul Barr and defendant at about 11 a.m. on October 20, 1983, and they departed Carbondale in his State vehicle and drove to the Dixie Truck Stop in Tuscola. There they met a black female. They were at the truck stop for about 10 minutes and then drove back to Carbondale. He stated that just after departing the Dixie Truck Stop defendant displayed a silver-colored .32-caliber Clerc brand revolver bearing Serial No. 133105. Braun examined it and returned it to Lilly. Braun also testified that he had another conversation with Paul Barr at approximately 11:45 a.m. on November 1 at Mr. Barr's residence. When Braum was asked what was said in that conversation, defendant objected on the grounds of hearsay, but the court received the testimony for the limited purpose of it relating to Mr. Barr's credibility. Braun then testified that Barr had told him that on the evening of October 30, 1983, he and John Lilly had gone to the square, found Eddie Fletcher, and killed him using the handgun that had been supplied by the third party at the Dixie Truck Stop in Tuscola. Braun said that Barr had told him that he had engaged Fletcher in conversation, at which time Lilly approached and shot Fletcher. Braun further stated that Barr told him that the murder weapon and the halloween costumes were thrown in a lake.

Nora Lee Farr Colbert testified for defendant and stated that she was on the Levee with Carolyn Patterson, a/k/a Carolyn Fletcher, on the evening of October 30, 1983. Ms. Colbert testified that she did not see defendant that night.

Deborah Smith, who was an officer with the Carbondale police department at the time of the shooting, also testified. She stated that Detective Strom dropped her off at defendant's apartment building at approximately 9:30 on the night in question, and she watched the apartment building. However, she could only see the north entrance. She did not see anyone enter the building but did observe a black male come from the back of the building on the first floor and go to the second floor.

Defendant first contends that the evidence did not establish his guilt beyond a reasonable doubt. However, after thoroughly examining the record, we find the evidence of his guilt was overwhelming.

A criminal conviction will not be set aside unless the evidence is so improbable that it creates a reasonable doubt of the defendant's guilt. Once a defendant has been found guilty, judicial review of all of the evidence is to be considered in the light most favorable to the

prosecution. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. ___, 88 L. Ed. 2d 274, 106 S. Ct. 267.) This rule is also applicable when it is the sufficiency of identification testimony that is attacked on review. See *People v. Milam* (1980), 80 Ill. App. 3d 245, 252, 399 N.E.2d 703, 707.

Defendant alleges that plaintiff's chief occurrence witness, Carolyn Fletcher, was simply not credible. However, we note that where conflicting evidence arises it is the province of the jury to determine the credibility of witnesses and the weight to be given their testimony, and in such function this court will not substitute its judgment for that of the jury or court. (*People v. Tensley* (1954), 3 Ill. 2d 615, 621, 122 N.E.2d 155, 158, *cert. denied.* (1956), 351 U.S. 967, 100 L. Ed. 1486, 76 S. Ct. 1032.) Sufficiency of identification testimony is also a question of fact for the jury, and the jury's determination will not be disturbed on review unless the testimony is so unsatisfactory as to leave a reasonable doubt of an accused's guilt. *People v. Strater* (1979), 72 Ill. App. 3d 486, 490, 390 N.E.2d 979, 982.

■■ Mrs. Fletcher had known Lilly since high school. She testified that she observed Lilly on October 30, 1983, walking south on Washington Street wearing faded jeans, a leather jacket, and a wolfman mask on the top of his head. She further testified that she observed Lilly with the wolfman mask on shoot her husband. She stated that when the shooting occurred, she yelled, "That's John Lilly, he shot D.C., Eddie Fletcher," and ran in to call the police. After thoroughly examining Fletcher's testimony, particularly her identifications of Lilly, we do not find it so contrary to the evidence as to be unjustified. See *People v. Milam* (1980), 80 Ill. App. 3d 245, 251, 399 N.E.2d 703, 707.

■ Defendant next focuses on the times and distances involved in the case, the testimony of Lilly's family, and the testimony of Officer Deborah Smith. The defendant's family members stated defendant was at 512 East Lance Street around 9 p.m. Mrs. Fletcher testified that she saw Lilly at 9 p.m. on the Levee. It is well settled that the trier of fact is not required to accept alibi testimony over the positive identification of an accused, even though the alibi testimony is given by a greater number of witnesses. (*People v. Jackson* (1973), 54 Ill. 2d 143, 149, 295 N.E.2d 462, 464.) We cannot overturn the verdict of the jury simply because the evidence presented was conflicting. *People v. Brown* (1972), 52 Ill. 2d 94, 106, 285 N.E.2d 1, 8.

Additionally we note defendant's own admissions are consistent with Mrs. Fletcher's account of the murder of her husband. The following exchange took place between defendant and Officer Kluge of

the Carbondale police following defendant's arrest on October 30, 1983. A tape of the interview was introduced into evidence and played for the jury.

"KLUGE: We're trying to determine, you know, what did happen. How do I know that both these people or all these people that were involved all didn't have guns and they were all trying to protect themselves in some way or another. You know Paul. Paul is obviously involved in this. Maybe you know better than we do who would be threatening him, who would be hassling with Paul, the kind of people we can talk to that we could go and say hey, what's going on here, what was the story. That's what we're trying to find out. And I know that you're smart enough to figure that out. So who could we go to now that would help us find out what happened here?

LILLY: I don't know, man. Hey, you're asking me. I mean, there's a million people. Ask her, she knows who was fighting him. I don't know.

KLUGE: Who?

LILLY: I don't know. Carolyn. She was right there. I mean, I heard her say my fuckin' name.

KUGE: Carolyn who?

LILLY: Patterson, I guess.

KLUGE: Is that her name?

LILLY: I don't know. She lives out at Lake Heights."

In the aforementioned interview defendant denied being on the Levee on the evening of October 30, 1983, but admitted hearing Carolyn Fletcher, a/k/a Carolyn Patterson, call his name.

■ Because of Mrs. Fletcher's identification testimony, Agent Braun's testimony that he observed a silver-colored revolver in the possession of the defendant, the testimony of Mr. Havekost of the FBI that the amounts of beryllium and antimony present on defendant's hands indicated that defendant had recently discharged a firearm or otherwise been close to a firearm when it discharged, and the defendant's own admissions in the interview with Officer Kluge, we find we should not disturb the verdict.

Defendant next contends that the trial court committed reversible error in allowing plaintiff to question Barr regarding a prior inconsistent statement he allegedly made during a November 1, 1983, conversation with Agent Braun. Barr had testified that he did not recall how Fletcher was shot, and he denied seeing anyone run from the area after hearing the shot. He stated that immediately after the victim was shot, he observed Jeff Moore remove a knife from the victim's hand.

The prosecutor expressed surprise, stating that said testimony was contrary to testimony given in a taped interview with Barr on October 31, 1983. The prosecutor was allowed to cross-examine the witness according to Supreme Court Rule 238 (87 Ill. 2d R. 238), and directed Barr's attention to a statement he allegedly made to Braun two days after the shooting in which he stated that he and John Lilly had decided on the previous Sunday, October 30, to locate Fletcher on the Square and that Lilly, dressed in a halloween costume, killed Fletcher. Barr denied ever making the statement. Barr was also asked if he told Braun that he helped Lilly throw the gun in a lake, and again he denied making that statement.

Supreme Court Rule 238, amended April 1, 1982 (87 Ill. 2d R. 238), states: "(a) The credibility of a witness may be attacked by any party, including the party calling him; (b) If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination."

Prior to this rule's amendment, a witness could be impeached by the party calling him, by proof of prior inconsistent statements, only upon a showing that the party called the witness in "good faith" and was "surprised" by his testimony. (Ill. Ann. Stat., ch. 110A, par. 238, Historical and Practice Notes, at 522 (Smith-Hurd 1985).) The sole purpose of impeaching evidence is to destroy the credibility of a witness and not to establish the truth of the impeaching evidence.

■ To reduce the risk that the jury might consider a prior inconsistent statement as independent evidence, the jury must be properly instructed to limit its consideration of the statement only for its narrow purpose. *People v. Bradford* (1985), 106 Ill. 2d 492, 501-02, 478 N.E.2d 1341, 1345.

Defendant cites *People v. Tate* (1964), 30 Ill. 2d 400, 402, 197 N.E.2d 26, 27-28, for the proposition that no man can confess to a crime for anyone but himself, and alleges that the State accomplished indirectly (by impeachment) what they could not do directly. However, in *Tate* our supreme court determined that the jury was not adequately instructed as to the limited purpose for which the impeaching evidence could be used.

Here the jury was instructed in the language of Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.11 (2d ed. 1981) as follows:

> "The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the wit-

ness in this courtroom."

█ We find the instruction provided an adequate safeguard that the jury would not give substantive character to the impeachment testimony. In any event, even if error was committed in allowing the impeachment, given the overwhelming evidence of guilt the complained of testimony could not affect the verdict.

█ Defendant next contends that the trial court committed reversible error when the court allowed the testimony of Agent Braun to be introduced in the defendant's trial.

Braun, an agent for the Illinois Department of Law Enforcement, testified that he met with Paul Barr on November 1, 1983, and had a conversation with him. The prosecution asked what, if anything, was said in the conversation, and defendant objected on the grounds of hearsay. The court cautioned the jury, stating:

> "All right. Now there is an objection to this conversation. I am going to permit Mr. Braun to answer the question for a limited purpose. It has nothing to do with the substance of the statement as it might deal with Mr. Lilly. But it has to do with the credibility of Mr. Barr and it is received only for that purpose at this time."

We agree with the trial court that the aforementioned statements are hearsay and substantively inadmissible. However, our supreme court has consistently held that evidence of prior inconsistent statements by a witness is admissible to impeach his credibility. (*People v. Bradford* (1985), 106 Ill. 2d 492, 478 N.E.2d 1341; *People v. Morgan* (1963), 28 Ill. 2d 55, 63, 190 N.E.2d 755, 759.) To lessen the risk that the properly admitted prior inconsistent statement of a witness be considered by the jury as testimony, this court has required that the impeachment not be repetitious and that the jury be clearly cautioned and instructed to limit its consideration of such evidence for its proper purpose. (*People v. Bradford* (1985), 106 Ill. 2d 492, 478 N.E.2d 1341; *People v. Moses* (1957), 11 Ill. 2d 84, 87, 142 N.E.2d 1, 3.) Here the trial court specifically admonished the jury that prior inconsistent statements were to be used only for the purpose of determining Barr's credibility. The court not only instructed the jury to restrict the use of prior inconsistent statements for impeachment purposes prior to allowing Agent Braun to testify to the November 1, 1983, conversation, but did so again in the jury instructions. See *People v. Marino* (1970), 44 Ill. 2d 562, 578, 256 N.E.2d 770, 779.

It is well settled that the determination of hostility for purposes of Supreme Court Rule 238 (87 Ill. 2d R. 238) rests within the discretion of the court and can only be made after a determination of the

demeanor and responses of the witness. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 926, 419 N.E.2d 578, 588; *People v. Swimley* (1978), 57 Ill. App. 3d 116, 129, 372 N.E.2d 887, 897, *cert. denied* (1978), 439 U.S. 911, 58 L. Ed. 2d 257, 99 S. Ct. 281.) Thus we do not find the trial court abused its discretion in letting Agent Braun testify, and we additionally find that in any event the jury was properly cautioned that the testimony was for impeachment purposes only.

    ■ Defendant next contends that the trial court erred by refusing to give the second paragraph of IPI Criminal 2d No. 3.02.

The State tendered and the court gave only the first paragraph of IPI Criminal 2d No. 3.02 as follows:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [the] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict."

The defense tendered IPI Criminal 2d No. 3.02 in its entirety, which set forth an additional paragraph:

> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

The second paragraph of the instruction should be given when the proof of guilt, as to each element of the offense, is circumstantial. *People v. Minish* (1974), 19 Ill. App. 3d 603, 606, 312 N.E.2d 49, 51.

Here the evidence was not entirely circumstantial. Mrs. Fletcher, an eyewitness, testified that she saw defendant wearing a werewolf mask shoot her husband. Furthermore, defendant's statement to Officer Kluge placed him at the scene of the offense. Given these facts the case at hand is distinguishable from *People v. Crow* (1985), 108 Ill. 2d 520, because the evidence was not completely circumstantial.

    ■ Defendant next contends that he was denied a fair trial by the introduction of his involvement in other unrelated criminal activity.

During the impeachment of Barr, the prosecutor elicited testimony concerning the trip to Tuscola with Braun and the defendant. Barr denied that defendant acquired a silver gun at that time and stated that the only thing they had was drugs. The prosecutor eventually elicited the fact that Barr had been convicted in Federal Court of conspiring to distribute cocaine and had received a five-year sentence.

We agree that evidence of collateral crimes is inadmissible if it is relevant merely to establish the defendant's propensity to commit

crimes. (*People v. Bartall* (1983), 98 Ill. 2d 294, 309, 456 N.E.2d 59, 66.) The issue is whether Barr's testimony was admitted only to establish defendant's reputation as a bad person deserving punishment or whether there was some other legitimate purpose for its admission. *People v. Albanese* (1984), 104 Ill. 2d 504, 517, 473 N.E.2d 1246, 1251, *cert. denied* (1984), 469 U.S. 892, 83 L. Ed. 2d 205, 105 S. Ct. 268.

As we previously mentioned, Barr was declared a hostile witness pursuant to Supreme Court Rule 238 (87 Ill. 2d R. 238), and the jury was summarily instructed that the testimony elicited was for impeachment purposes only. Thus the testimony had a proper purpose.

■ Defendant further contends that Agent Braun should not have been allowed to testify regarding the trip to Tuscola. However, Braun stated that he was working on an undercover investigation when he met Paul Barr and that Barr had introduced him to the defendant. He stated that he traveled from Carbondale to Tuscola with defendant and Barr. Braun was asked by the prosecutor, "Did anyone else travel with you from Carbondale to Tuscola other than the defendant and Paul Barr?" Braun replied, "In my car, no. There was a surveillance team that followed me to Tuscola and back to Carbondale." At that time, the jury was asked to leave, and the court instructed the witness not to go beyond answering the questions, particularly not to state anything that might indicate that defendant may have been involved in some other illegal activity. Braun went on to testify that after leaving the truck stop Lilly displayed a silver colored .32-caliber Clerc brand revolver and that he had obtained the gun from Rose Johnson whom he had met at the Dixie Truck Stop in Tuscola.

We find that the mere mention of the word "surveillance" was not enough to indicate to the jury that defendant had committed collateral crimes, and the evidence concerning the handgun was introduced for a proper reason, namely to show that defendant was in possession of a handgun very similar to the murder weapon described by the witness.

■ Defendant next alleges that he was denied his right to a fair trial by the improper closing argument of the prosecutor.

The following statements were made by the prosecution in closing argument:

"How, ladies and gentlemen, did he get antimony and beryllium on his hands? How he's going to tell you—

MR. WELCH: Objection, your Honor.

THE COURT: Sustained.

* * *

I ask you why on October 20, 1983, did John Lilly acquire a .32 caliber gun if he did not have some intent in mind for the use of that weapon? I haven't heard any gun collection stories. I haven't heard any hunting trip stories, target practice stories. I don't have to explain—

MR. WELCH: I object to the shifting.

THE COURT: Mr. Clemons, the objection is going to be sustained. The defendant does not have any burden of explanation in this case."

Defendant relies on *People v. Weinstein* (1966), 35 Ill. 2d 467, 469-70, 220 N.E.2d 432, 433-34, for the proposition that the burden of proof never shifts to the accused but remains the responsibility of the prosecution throughout the trial. In *Weinstein,* our supreme court reversed and remanded for a new trial because the prosecutor repeatedly stated that it was the burden of the defendant to present evidence creating a reasonable doubt of guilt. However, in the case at hand, the prosecutor pointed to defendant's failure to submit any evidence that would tend to refute the case against him.

Defendant also contends that the State argued substantively the testimony given by witnesses Barr and Braun that was admitted for impeachment purposes only. However, defendant objected to the prosecutor's statement that "Paul Barr comes in here and tells you he didn't talk to him about anything that day but drugs. What do you think was the big topic of discussion?" The court sustained the objection and admonished the jury to disregard the last comment.

In rebuttal, the prosecutor stated, "I submit to you that the gun's probably in the lake somewhere buried in the mud. We don't know. That's where Paul Barr said it was. They looked. They couldn't find it." Defendant objected and the court sustained the objection, striking the remark from the record and admonishing the jury to disregard it. After examining the record, we find that any error was eliminated by the giving of curative instructions to the jury after sustaining the objections. The evidence against defendant was so overwhelming that the remarks, even if prejudicial, did not materially affect the jury's verdict. *People v. Horne* (1984), 129 Ill. App. 3d 1066, 1072-73, 473 N.E.2d 465, 469-70.

Defendant further alleges that he was denied a fair trial because the trial court denied his motion for a mistrial. However, as we previously mentioned, the testimony of Barr and Braun was properly introduced and limited, and the State's closing argument was not so prejudicial as to deny defendant a fair trial. *People v. Albanese* (1984), 104

Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1984), 469 U.S. 892, 83 L. Ed. 2d 205, 105 S. Ct. 268

Finally, defendant contends that it was error to deny his motion for a directed verdict. However, again as we previously mentioned, the record as a whole demonstrates that defendant's guilt was proved beyond a reasonable doubt.

For the foregoing reasons, the judgment of the circuit court of Jackson County is affirmed.

Affirmed.

JONES, P.J., and HARRISON, J., concur.